DEPOSITION OF ROGER JENKINS

August 7, 2017

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

----------------------------------
KELL BRUNARSKI and YVETTE HARMAN,      )
                                       )
        Plaintiffs,                    )
                                       )
vs.                                    ) CASE NO.
                                       ) 1:16-CV-0311
MIAMI UNIVERSITY,                      )
                                       )
        Defendant.                     )
----------------------------------

APPEARANCES:

            FOR THE PLAINTIFFS:

            ROBERT F. CROSKERY, ESQ.
            Croskery Law Offices
            810 Sycamore Street, 2nd Floor
            Cincinnati, Ohio  45202

            FOR THE DEFENDANT:

            CHRISTINA L. CORL, ESQ.
            Plunkett Cooney
            300 East Broad Street, Suite 590
            Columbus, Ohio  43215

ALSO PRESENT:

            Kelly Brunarski and Yvette Harman
            (Participating Telephonically)

1                S T I P U L A T I O N S

2          The deposition of ROGER JENKINS, called as a

3    witness at the instance of the Plaintiffs, taken

4    pursuant to all rules applicable to the Federal Rules

5    of Civil Procedure by notice on the 7th day of August,

6    2017, at 8:12 a.m., at the residence of Roger Jenkins,

7    3933 Topside Road, Knoxville, Tennessee, before Rhonda

8    S. Sansom, RPR, CRR, CRC, Licensed Court Reporter,

9    pursuant to stipulation of counsel.

10          It being agreed that Rhonda S. Sansom, RPR,

11   CRR, CRC, Licensed Court Reporter, may report the

12   deposition in machine shorthand, afterwards reducing

13   the same to typewriting.

14          All objections except as to the form of the

15   questions are reserved to on or before the hearing.

16          It being further agreed that all formalities

17   as to notice, caption, certificate, transmission, et

18   cetera, excluding the reading of the completed

19   deposition by the witness and the signature of the

20   witness, are expressly waived.

21

22

23

24

25

1                     I N D E X

2              E X A M I N A T I O N S

3

4   ROGER JENKINS                              Page

5       Examination by Mr. Croskery               4

6

7                   E X H I B I T S

8              (No Exhibits Were Marked)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Roger Jenkins (8/7/17)

```
                                                     Page 4
 1                    ROGER JENKINS,

 2    having first been duly sworn, was examined and deposed

 3    as follows:

 4                        EXAMINATION

 5    BY MR. CROSKERY:

 6         Q.      Good morning, Mr. Jenkins.  Is it

 7    Dr. Jenkins?

 8         A.      It is, yes.

 9         Q.      All right.  Dr. Jenkins, we haven't met

10    before.  My name is Robert Croskery, and I represent

11    the plaintiffs Brunarski and Harmon in a suit filed

12    against Miami University.

13                 Before we get started, have you had your

14    deposition taken before?

15         A.      I don't think I've ever had a deposition

16    taken, no.

17         Q.      It's a fairly simple process.  Rhonda, on

18    your right, is going to be taking down everything that

19    we say, both questions and answers.  And so for that

20    reason, since she's producing a written transcript that

21    looks a little bit like a play, if we'd follow a few

22    rules it'd make it easier.

23                 First of all, if you don't understand one

24    of my questions, let me know and I'll be happy to

25    rephrase it for you.  Can you do that for me?
```

Roger Jenkins (8/7/17)

Page 5

1          A.     Yes.

2          Q.     Okay.  Also answer out loud, instead of

3     shaking or nodding your head.

4          A.     Yes.

5          Q.     If you answer "Yes" or "No" instead of

6     "Uh-huh" or "Huh-uh," we'll get a clearer transcript.

7          A.     Yes.

8          Q.     Are you under any medication today that

9     would interfere with you giving truthful and accurate

10    testimony?

11         A.     No.

12         Q.     Do you know of any other reason why you

13    could not give truthful and accurate testimony today?

14         A.     No.

15         Q.     Are you familiar with the lawsuit that's

16    been filed by professors Harman and Brunarski?

17         A.     I am not.

18         Q.     Have you done anything to prepare for

19    this deposition?

20         A.     I have not.

21         Q.     All right.  Well, it should be fairly

22    simple.

23                This lawsuit, in general, concerns an

24    allegation that my clients were paid less than other

25    similarly situated professors at Miami University, so

Roger Jenkins (8/7/17)

Page 6

1    the questions I'm going to be asking you primarily will

2    concern a period of time back in 2011 to 2012.

3                   I understand you were leaving the

4    university about that time; is that right?

5          A.      I think 2013, if I recall, was when I

6    retired.

7          Q.      All right.  So did you have involvement

8    then in setting salaries for the 2012-2013 school year?

9          A.      I would expect that I did, yes.

10         Q.      What was your position in 2012 and 2013

11   at Miami University?

12         A.      Dean of the business school.

13         Q.      And how long had you held that position?

14         A.      Thirteen years.

15         Q.      Can you tell me in general what the

16   duties of the dean were in regard to setting salaries

17   of professors in the business school?

18         A.      The -- the process went as follows.  The

19   department head in a given department would receive an

20   amount of money for his or her faculty.  Based upon

21   their deliberations on how that money was to be given,

22   merit and so forth, they would make recommendations.

23                 And each department head would sit down

24   with the associate dean for academic affairs, my senior

25   associate dean, and they would go over those

Roger Jenkins (8/7/17)

Page 7

1    recommendations with him.  He would ask the appropriate

2    questions, and he would try to feel comfortable and be

3    in agreement with the recommendations.

4            And then he would sit down with me and

5    say, "Here" -- for a given faculty, out of 120

6    faculty -- "Here is the recommendation of the

7    department head.  Here is my recommendation.  Here's

8    why we are proposing these numbers.  And I'd like for

9    you to ask any questions to make sure that we're

10   doing -- haven't missed anything."

11           And so that's how the process worked.

12      Q.      I appreciate that.

13           And can you tell me what factors were

14   supposed to be weighed by those who were making the

15   determination about salaries?

16      A.      Performance was always the key variable

17   in making faculty salary decisions.  Performance.

18           Performance, along different dimensions.

19   The two most important performance dimensions were

20   teaching quality and effectiveness and research

21   scholarship.  Those were the two big ones.

22           Other ones would include contributions to

23   the business school; contributions to a larger, you know,

24   area of interest that the person had with regard to

25   offices and positions in national and international

Roger Jenkins (8/7/17)

Page 8

1    organizations to promote different kinds of things.

2            But by far, the two dimensions that were

3    weighted most heavily were teaching performance and

4    research and scholarship.

5        Q.      All right.  I think you mentioned,

6    doctor, teaching quality and effectiveness.  And can

7    you give me a feel for generally how those were

8    measured?

9        A.      Teaching quality at Miami, as you would

10   know, as it is a university ranked in the top three

11   nationally in terms of teaching quality.  You know,

12   when you're hired at Miami you're normally hired

13   because you're a very effective teacher.  That's a huge

14   part of the hiring requirement.

15           How is teaching effectiveness, how was it

16   evaluated during my tenure?  By various methods.  One was

17   certainly teaching awards, whether it be a teaching award

18   given as the best teacher in the business school, a

19   teaching award at the university level.

20           So teaching awards and peer evaluation of

21   teaching effectiveness in that respect was always very,

22   very important.

23           If a -- if a professor was asked to teach

24   internationally or to teach in various programs that were

25   showcasing the business school, whether it be to incoming

Roger Jenkins (8/7/17)

Page 9

1   parents or incoming students who were visiting Miami,

2   those were always important evaluators of teaching

3   performance.

4              Obviously, every university uses teaching

5   evaluations.  Miami has used those, the business school

6   used those.  Those were a criteria; I don't think one --

7   from my recall, I don't believe one was ever, ever

8   weighted very heavily.

9       Q.     Who chose how to weight the factors?  Was

10  that done by a standard operating procedure?

11      A.     No, no, it was done by each department

12  chair, each associate.  Each person had their own way.

13  There were no standards which said "You will evaluate

14  teacher performance by points in this way."  There was

15  no such procedure.

16      Q.     What type of student teaching evaluations

17  were available for use?  Were they online or were they

18  written by the students at that time?

19      A.     You know, I don't recall.  I suspect that

20  they were -- at one time, when I first came, I know

21  they were passed -- the professor would pass them out

22  at the end of each term as a written evaluation, and

23  they would fill them out and leave them as they left.

24              Now, I'm not sure over a 13-year period

25  if at the end they were all done online.  It could, I

Roger Jenkins (8/7/17)

Page 10

1    don't remember.  It could be the students all brought a

2    computer to class and they all filled it out in class.

3    I don't recall what was happening online at the time.

4         Q.      All right.  Now, you mentioned I believe

5    earlier that all the teachers that were hired at Miami

6    were very effective.  That was one of the criteria that

7    you looked for in just hiring new faculty; is that

8    right?

9         A.      Well, yeah.  From the time that I arrived

10   at Miami until the time I left, hiring the right

11   faculty was a huge part of my philosophy, huge part.

12   So, yeah, since I made the final decision on hires --

13   anyone that was hired, you know, during my tenure -- I

14   felt very good about their -- their teaching

15   effectiveness and the quality of their teaching.

16        Q.      Is it fair to say, then, that all the

17   tenured professors that you had were highly effective

18   teachers?

19        A.      No, not at all.  No.

20        Q.      Some were not effective?

21        A.      Half of the faculty, when I got there,

22   were -- were hired before me.

23        Q.      All right.  When did you get there?

24        A.      In 2013.  Probably 2001 or '02.  Sometime

25   like that.

Roger Jenkins (8/7/17)

Page 11

1      Q.      So certainly the hires that were made

2  since 2001 or 2002 were all very effective teachers

3  because you were overviewing their hiring?

4      A.      That was an important criteria that I

5  set, yeah.

6      Q.      Is it fair to say that of the teachers

7  that you hired during the time that you were there,

8  oversaw the hiring of, that there wasn't a lot of

9  differentiation in teaching ability?

10     A.      No, I wouldn't.  That's not fair at all.

11     Q.      Okay.  So there was a wide variety of

12 teaching ability?

13     A.      There always is.

14     Q.      Okay.  And in evaluating that, the

15 factors that were used were teaching awards I think is

16 one that you mentioned.

17     A.      Yes, teaching awards.  Opportunities to

18 teach internationally in special programs.

19 Opportunities to showcase teaching talent to audiences

20 that were very important to showcase Miami's teaching

21 quality.

22     Q.      So did the teaching awards carry their

23 own financial stipend?

24     A.      I don't recall.  But most of them carried

25 a stipend of $1,000 or $2,000, as I recall.

Roger Jenkins (8/7/17)

Page 12

1      Q.      And how did a teacher get an award?  Was

2  that something that was voted on by other faculty

3  members or was it something that was awarded by

4  students?  Did it vary?

5      A.      It varied from school, from business

6  school to how a different school would handle it.  At

7  the Miami level, if they were doing a Miami-level

8  award, that would vary in terms of how it was decided.

9              But in the business school, there was a

10 faculty committee that was in charge of awards.  And

11 they would set the criteria, they would ask for

12 nominations, they would -- they would interview.  You

13 know, they had their own process of coming up with the

14 recipient.

15     Q.      So that was true in the Finance

16 Department, as well?

17     A.      Well, there wasn't -- each department

18 didn't have an outstanding teacher award.  There was

19 only a business school-wide outstanding teacher award.

20     Q.      I see.

21     A.      There was usually one at the senior

22 level, at the junior level.

23     Q.      And what was the senior level considered

24 to be?  Is that tenured?

25     A.      Tenured, associate, or full.

Roger Jenkins (8/7/17)

Page 13

1    Q.      So how did this Finance Department -- I'm

2  sorry.  How did the business school faculty that was in

3  charge of doing these awards come up with what awards

4  they gave?

5    A.      Ask your question again.

6    Q.      I'm concerned with -- you mentioned that

7  the awards were an important part, oftentimes --

8    A.      Uh-huh.

9    Q.      -- of setting salaries.

10   A.      Uh-huh.

11   Q.      So I was curious as to this faculty

12  committee you were talking about --

13   A.      Uh-huh.

14   Q.      -- from the school of business that set

15  up awards.

16   A.      Uh-huh.

17   Q.      Did you ever sit in on those discussions?

18   A.      I never did, no.

19   Q.      Do you know what criteria they used?

20   A.      I do not know.

21   Q.      Okay.

22   A.      Each of the persons that were sat on that

23  committee were viewed as outstanding teachers

24  themselves.  So in essence, you had a team of

25  outstanding teachers evaluating their own peers across

Roger Jenkins (8/7/17)

Page 14

1    the school and then making a determination about who

2    was the best of the best.

3         Q.      Do you know whether or not they

4    considered student teaching evaluations in making their

5    awards?

6         A.      I do not know.

7         Q.      Now, you also mentioned international --

8    international teaching as one of the criteria that was

9    used, as I recall.

10        A.      Uh-huh.

11        Q.      Tell me a little bit about that.  What

12   opportunities were there to teach internationally at

13   Miami?

14        A.      We encouraged all of the faculty to spend

15   a semester or a summer abroad teaching and taking

16   students to study with, for -- for obvious reasons.

17   It's a global-global world.

18               Many of the professors -- and you would

19   apply.  Professors would apply for this particular

20   opportunity.  And if they were chosen, then they would

21   go.

22               And obviously, on those decisions as they

23   were made in terms of who were selected to go, the better

24   professors teaching-wise were the ones that were selected

25   to go.

Roger Jenkins (8/7/17)

Page 15

1    Q.    Did you have some input on which
2  professors were chosen?
3    A.    I had no input on that.
4    Q.    Were you ever asked for advice on that?
5    A.    No, I wasn't.
6    Q.    Okay.  Did you, yourself, have any
7  international teaching experience?
8    A.    Yes.
9    Q.    Tell me about that.  What experience did
10  you have?
11    A.    Well, I've lectured in China.  I've
12  lectured in Germany, London.  I've lectured in South
13  America, in Chile.  So I've lectured a good bit
14  internationally.
15    Q.    What do you normally lecture on?
16    A.    Marketing strategy, business strategy.
17    Q.    Of the locations that you've mentioned,
18  were there any that had international teaching
19  opportunities for Miami professors?
20    A.    Most -- most of those, with the exception
21  of the one Chinese university, I would have done when I
22  was at the University of Tennessee in Knoxville or Wake
23  Forest, and not at Miami.  Because at Miami, as dean, I
24  could not spend a semester or summer lecturing.  I
25  would give some lectures when I went abroad to Asia,

Roger Jenkins (8/7/17)

Page 16

1    but I did not spend a summer or semester lecturing.

2         Q.       You mentioned going abroad to Asia.  Were

3    you going abroad to Asia then?

4         A.       As dean for 13 years, I averaged one trip

5    to Asia a year.  My philosophy was that China was a

6    very important country and that we needed to expose our

7    students and faculty to China, so I set up a huge

8    number of exchange relationships with a lot of Chinese

9    universities.

10                 So I spent a semester -- I spent about a

11   month a year in Asia; in particular, China, Korea, and

12   Vietnam.

13        Q.       All right.  So in China, Korea, and

14   Vietnam, were there then exchange opportunities in

15   Korea, Vietnam, and China?

16        A.       There have been, yes.

17        Q.       All right.

18        A.       Or there were, yes.

19        Q.       What about the timeframe from 2010, '11,

20   '12, '13?

21        A.       I have no recall of that with

22   specificity.

23        Q.       Can you tell me what relationship

24   exchange opportunities that there were with China?

25        A.       Well, we had -- we had several

Gibson Court Reporting
865-546-7477

Roger Jenkins (8/7/17)

Page 17

1  universities that wanted our professors, one of our

2  professors, to spend a semester there or a summer there

3  teaching, and then they would want to send one of their

4  professors back to Miami for a semester.  That was a

5  typical exchange arrangement.

6          Q.      I see.  And when you say "teaching," does

7  that mean that a Miami professor was teaching Chinese

8  students in China?

9          A.      Yes.

10          Q.      And conversely, the Chinese professor

11  came back and talked to Americans that were --

12          A.      Although, yeah, we had less success with

13  a Chinese professor coming back and teaching Americans

14  because the language was an issue.

15          Q.      So most of the Chinese students spoke

16  English?

17          A.      Yes.

18          Q.      I understand.  At least the ones that

19  were taking the classes from the American professors?

20          A.      Yes.

21          Q.      But you didn't have that many Chinese

22  professors that spoke English fluently?

23          A.      Ask your question again.

24          Q.      Well, I'm trying to understand why it

25  would be more difficult for the Chinese professors to

Roger Jenkins (8/7/17)

Page 18

1  teach in America.

2      A.      The China professors, their English was

3  not as good as the students' English.

4      Q.      Presumably because it's now taught at a

5  young age --

6      A.      Yes.

7      Q.      -- and it wasn't?

8      A.      They didn't have it as a high school

9  four-year program like their students did.

10     Q.      I understand.

11             So were you with any -- during the times

12  that you were in Asia, were you there when any of the

13  professors were teaching?

14     A.      Yes.

15     Q.      Can you remember, for example, whether or

16  not Professor Shrider was ever there while you were

17  there?

18     A.      I cannot recall specifically.  I can't

19  recall specifically.

20     Q.      What about Professor Nixon?

21     A.      I don't think -- I do not think I was

22  there when he was teaching.

23     Q.      All right.  Now, are you aware of any

24  female professors that were selected to go teach in

25  China?

Roger Jenkins (8/7/17)

Page 19

1        A.      Female professors that were selected to
2   go teach in China?  I can't recall.
3        Q.      You can't recall any as you sit here; is
4   that right?
5        A.      Yeah, I can't recall as I sit here.
6        Q.      What about the other locations you
7   mentioned, Korea and Vietnam?  Can you recall any
8   female professors from Miami that went -- that taught
9   at either of those locations?
10        A.      I can't -- no, I can't recall any.  I
11   know Terry -- we had a female professor, Terry, who
12   actually was in charge of the international programs
13   for a few years.  I know that -- I remember that she
14   taught in several countries, and she may indeed have
15   been one that taught in China.
16        Q.      What was her first name?
17        A.      Terry was her first name.
18              MS. CORL:  Her first name is Terry.
19              THE WITNESS:  I can't remember her last
20        name.
21   BY MR. CROSKERY:
22        Q.      Oh, Terry is the first name?
23        A.      Yes.  And she actually was in charge of
24   all international programs.  She made the decisions of
25   which countries to go, which faculty to take.  She --

Roger Jenkins (8/7/17)

Page 20

1    she would be the person you would want to find out

2    about who went where, and why.

3          Q.      Who was your associate dean during the

4    last few years of your tenure at Miami University?

5          A.      My senior associate?

6          Q.      Right.

7          A.      Well, I have two associate deans.  The

8    senior associate dean for academic affairs, which was

9    the COO -- you know, my guy that ran the day to day at

10   the business school -- was Tim -- I forget Tim's last

11   name.

12         Q.      Krehbiel?

13         A.      Tim Krehbiel, yeah.

14         Q.      And who was your junior associate dean?

15         A.      Let's see.  At that time, I can't recall

16   actually who the senior -- the junior guy was, or

17   junior person was.

18         Q.      Was it Ray Gorman?

19         A.      No, Ray was my senior associate dean

20   before Tim for, I don't know, eight years.

21         Q.      Okay.

22         A.      So Tim followed Ray.

23         Q.      Can you recall when Tim came in?

24         A.      No, I don't.

25         Q.      Was it -- well --

Roger Jenkins (8/7/17)

Page 21

1        A.        I don't remember at all the year.

2        Q.        Was it close to the time that you left

3    Miami?

4        A.        No.  No, Tim had worked with me for --

5    for several years before I left.

6        Q.        All right.  So the one who had been

7    advising you in the 2010-'11-'12 timeframe would have

8    been Tim?

9        A.        Would have been Tim.

10       Q.        All right.  Do you recall Ray Gorman

11   giving you any opinion about Kelly Brunarski's --

12   Professor Brunarski's quality as a faculty member?

13       A.        No, I don't.  Ray -- Ray was a finance

14   professor and certainly knew all the finance professors

15   extremely well.

16       Q.        Doctor, did you have a legal dispute with

17   a female faculty member while you were a dean at Miami?

18       A.        Yes, probably Christina -- a lady named

19   Christina, who was in charge of the entrepreneurship

20   program.

21       Q.        Tell me about that.  What happened?

22       A.        Let's see if I can even recall what the

23   dispute was about.

24                 I don't remember whether -- whether --

25   whether she was fired and the dispute was as a result

Roger Jenkins (8/7/17)

Page 22

1  of that, or whether -- I tend to recall that she was

2  fired for poor performance.  I could be wrong, but

3  that's my memory.

4          Q.      Do you remember how that dispute was

5  resolved?

6          A.      I do not remember whether the university

7  wound up paying her something.  I do not recall how the

8  dispute was resolved.

9          Q.      So her first name was Christina.  You

10 don't remember her last name; is that right?

11         A.      Huh-uh, I don't.

12         Q.      All right.

13         A.      That was, you know, back in my early

14 tenure as dean.

15         Q.      Now, you had indicated to me that each

16 department got a pool of money to start with that they

17 were to allocate to their professors for pay raises.

18         A.      Uh-huh.

19         Q.      Was there also another pool that was

20 given for super-merit raises?

21         A.      Yes.  From year to year it varied, based

22 on what the university money was and what it gave to

23 the school.

24                 When money -- when we -- when we could,

25 when the business school could, we would save a pot of

Roger Jenkins (8/7/17)

Page 23

1    money in the dean's office for allocation to

2    superachievers, super-merit winners, that we didn't

3    want to lose as faculty.

4              We -- Miami was always -- we were rarely

5    at the market for any faculty.  We just -- we, in

6    general, weren't paying at the market for the business

7    school.  If we looked at -- and each year we would look

8    at the ACSB averages for rank for schools in our

9    grouping, we were always at the low end.

10             So, yeah, we had a -- we would try to

11   always have a pot of money in the dean's office that

12   the associate and I would sit down and say, "Okay, are

13   there faculty here where they're so below market and we

14   do not want to lose the super performance that we

15   should allocate some money to bring them closer to

16   market?"  So, yes, there was that kind of decision.

17        Q.     Okay.  And what were the factors that

18   went into making the super-merit decisions?  Were they

19   the same as the factors in the regular pool?

20        A.     They were.  The additional -- they were,

21   really, because department heads also knew what the

22   market was for their faculty, and so they also knew

23   which faculty they didn't want to lose.  So in answer,

24   yes.

25             But the reason that we had some in the

Roger Jenkins (8/7/17)

Page 24

1    dean's office was and wanted to save that money

2    differently was each department would -- would advocate

3    that, you know, we have more faculty below market.

4    Each department would argue that.

5         Q.      Of course.

6         A.      We try at the dean's office to be a

7    leveler, to say, "Okay, given what we see across all

8    the faculty, across all the departments, clearly these

9    folks' performance and teaching and research and

10   scholarship are exceptional.  We don't want to lose

11   these people, so let's make them closer to market."

12        Q.      And Dr. Jenkins, I want to go back to the

13   beginning of the deposition when I had asked you what

14   the factors were that went into the regular pool

15   raises, and you mentioned one of them as being teaching

16   quality and effectiveness and the second as being

17   research that you mentioned as very important.

18        A.      Uh-huh.

19        Q.      Tell me about that.  How was research

20   measured?

21        A.      Number of publications, quality of

22   publications, impact of publications, where the

23   publications appeared, rankings of journals.

24   Academically, typical kinds of criteria for measuring

25   research and scholarship.

Roger Jenkins (8/7/17)

Page 25

1          Q.          All right.

2          A.          Nothing different.

3          Q.          So you would look to whether or not a

4    publication was a top tier, a second tier, a third

5    tier?

6          A.          Yes.

7          Q.          Was there any particular form for

8    determining particular top tier, second tier, third

9    tier?

10          A.          I'm not sure I understand your question.

11          Q.          Well, I know because we just talked about

12    it that you have different tiers, levels of

13    publications.

14          A.          Uh-huh.

15          Q.          And the more prestigious the publication,

16    presumably the more the research counts?

17          A.          Yes, right.

18          Q.          I was just wondering how you determine

19    what is top tier, second tier, third tier.

20          A.          Well, in each -- in each academic area

21    there are plenty -- plenty of data which in the finance

22    area the top journals are one, two, three, four, five

23    ranked.  There's plenty of data for every department

24    that shows what the top journals are nationally.

25          Q.          I see.

Roger Jenkins (8/7/17)

Page 26

1      A.      And it even goes down to second-tier or

2   third-tier journals or proceedings, so each department

3   doesn't have to reinvent a paradigm for measuring

4   research and scholarship.

5                And it is to the -- each year, when the

6   faculty fills out their own review and talks about

7   their publications and so forth, it is their

8   responsibility to validate the quality of the research

9   and scholarship by citing just what I've described.

10               Even at the university level, when all the

11  deans make a promotion and tenure decision for any

12  faculty at the university, that faculty again has to

13  produce all the kinds of proof of "Here's why my

14  scholarship and here's why my research is outstanding."

15               Because a dean in architecture wouldn't

16  know anything about the finance faculty, so they would

17  depend upon the candidate, you know, measuring the

18  quality of their own research and scholarship.

19               MR. CROSKERY:  Okay.  Just because I've

20          got my clients on the phone and I need to talk to

21          them every now and again, let's take a short

22          break.  I'm going to step outside for a second and

23          break this phone call down, talk to my clients.

24               We'll come back in and reconvene in a few

25          minutes.

Roger Jenkins (8/7/17)

Page 27

1                     THE WITNESS:  Okay.

2                     MR. CROSKERY:  I appreciate it.

3                     (Recess at 8:40 a.m. to 8:43 a.m.)

4    BY MR. CROSKERY:

5         Q.     I want to go back to the international

6    opportunities for just a minute.  Is it fair to say

7    that one of the factors used in determining who got the

8    international opportunities was teaching evaluations?

9         A.     I have no idea as to whether when those

10   decision were made, those selections were made, whether

11   teaching evaluations were used.  I have no idea.  I

12   would be surprised if they were.  I do not know.  I

13   would be very surprised if they were.

14                    Because when you have a -- when you have

15   a tight business school like Miami, the faculty know

16   each other really well.  And every faculty has deep

17   relationships with a large number of students, and so

18   that -- those faculty deep relationships provide

19   feedback to faculty about peers, how good they are or

20   aren't in the classroom and so forth.

21                    So each faculty member themselves will

22   develop a database individually, based on what they

23   hear from students who have sat in Class A, Class B,

24   Class C; you know, who is good and who isn't good.

25                    So I do not know if the committee and the

Roger Jenkins (8/7/17)

Page 28

1  director of international studies who makes those

2  selections, I don't know if they use teaching evaluations

3  or not.  But I would be very surprised if they did

4  formally.  I would be very surprised.

5       Q.       Well, it's interesting that you said

6  "formally."  Because it seems to me if what you said is

7  true, that they're developing their own database based

8  on students that have sat in on other professors'

9  classes and perhaps shared information, isn't it fair

10  to say that if the students are sharing information

11  with them on an informal basis on other professors that

12  that same information is likely to be reflected in

13  teaching evaluations?

14       A.       I don't understand your question.

15       Q.       Well, you just told me that you believe

16  there was sort of an informal database that's being

17  developed.  One faculty member would say he's got

18  students that have been in several other professors'

19  classes, and those students would share with them their

20  opinions of what the other professors were.

21       A.       Uh-huh.

22       Q.       Now, it seems to me that if students were

23  sharing with Faculty Member A their opinions about

24  Faculty Member B, isn't it likely those opinions that

25  they are sharing with Faculty Member A about Faculty

Roger Jenkins (8/7/17)

Page 29

1   Member B are going to be reflected in the teaching

2   evaluations they give Faculty Member B?

3            MS. CORL:  Objection, calls for

4        speculation.

5            THE WITNESS:  I was going to say, that's

6        pure speculation.  You're asking me does it seem

7        likely?  I don't know.

8            I was at Wake Forest for five years

9        before I came to Miami.  Wake Forest and Miami are

10       very similar in that teaching quality is at the

11       heart of the ethos of what they're all about.

12           In the business school at Wake Forest,

13       every faculty member knew who the good teachers

14       were and the bad teachers were.  Every faculty

15       knew that, because they had very close

16       relationships with the students and those students

17       would share that feedback.  And the same at Miami.

18   BY MR. CROSKERY:

19       Q.      Let's do it this way.  There's an

20   informal method for sharing feedback, which is just

21   talking maybe in after-class environments, getting

22   together at social hour and that type of thing.

23       A.      Uh-huh.

24       Q.      There's also a more formal mechanism,

25   which is the teaching evaluation.

Roger Jenkins (8/7/17)

Page 30

1     A.      Correct.

2     Q.      So can you tell me why in the world a

3 faculty member would be relying upon informal sharing

4 at social gatherings and so forth about other

5 professors rather than relying on a tool that's made

6 available by Miami for that purpose, the student

7 teacher evaluation?

8     A.      I suspect that each faculty -- I suspect

9 both were used.

10    Q.      All right.

11    A.      I suspect both were used.

12            Teaching evaluations were a formal

13 mechanism.  Another powerful one, if not more powerful,

14 is simply the feedback from students themselves

15 directly based on faculty relationships.

16    Q.      Well, let me ask you this, professor.

17 You've been through it sounds like decades of teaching

18 experience.

19    A.      Uh-huh.

20    Q.      And in various schools, Tennessee and

21 Wake Forest and Miami University, although maybe not as

22 much teaching at Miami.

23    A.      No, I didn't teach at Miami.

24    Q.      But during the times that you were doing

25 teaching, was it your experience that the informal

Roger Jenkins (8/7/17)

Page 31

1   sharing that you got from students tended to match up

2   fairly well with what the student teaching evaluations

3   were?

4        A.      Good question.  Let me just reflect on

5   that a second.

6                At the University of Tennessee, in the

7   first five years I was there I won every teaching award

8   the university offered, so I consider myself a very

9   effective teacher.  I won the award at the business

10  school the first two years and then the third year I

11  won the university-wide one, which was the first year I

12  was eligible.  So I do consider myself an effective

13  teacher and so forth.

14               Ask the same question again.  Let me see if

15  I understand -- I understand what you mean.

16       Q.      Well, I'm just asking you from your

17  experience, whether or not the formal teaching

18  evaluation, student teaching evaluations which I

19  understand are fairly universal in colleges and

20  universities, matched up with this informal database

21  that you were talking about a few minutes ago.

22       A.      I think yes.  I think the answer is

23  "Yes."

24       Q.      So whether you were relying upon your

25  informal database or whether you were relying upon the

Roger Jenkins (8/7/17)

Page 32

1    student teaching evaluations probably wouldn't make

2    very much difference, correct?

3                MS. CORL:  Objection, calls for

4        speculation.

5    BY MR. CROSKERY:

6        Q.      Well, I don't want you to speculate.  I'm

7    just asking you, based on your experience.

8        A.      I don't know.

9        Q.      All right.  Let me ask you this.  Did

10   shadowing in international assignments carry the same

11   weight as actually teaching in international

12   assignments?

13       A.      No.  No, that was a learning process from

14   which, after that, supposedly you could own the class

15   and own the responsibility for having those students

16   there for that time period.

17       Q.      So the data we were talking about

18   earlier, it involved what we would call market

19   adjustment rate.  I think you were telling me that

20   Miami University traditionally had faculty paid at the

21   lower end --

22       A.      In the business school, yes.

23       Q.      -- of comparable universities?

24       A.      Yes, yes.

25       Q.      Now, first of all, in the timeframe that

Roger Jenkins (8/7/17)

Page 33

1    you were there -- and let's focus on the last few

2    years, because that's what this lawsuit is about --

3    where was Miami's business school ranked nationally?

4         A.    Top 25.

5         Q.    Top 25?

6         A.    Uh-huh.

7         Q.    So the other business schools that you

8    were measured against were --

9         A.    Top 25.

10        Q.    -- Top 25 schools?  All right.

11              And if I understand your statement

12   correctly, is that weighted for the cost of living?

13        A.    No.

14        Q.    All right, So just making a straight

15   comparison.  But the cost of living was --

16        A.    We subjectively, based on what we knew,

17   would weight that as we evaluate it.  So we didn't --

18   we didn't go -- we didn't say if a school, if No. 3 was

19   in Philadelphia, that we look at that the same as

20   Oxford, Ohio.  No, we didn't do that.  We would

21   subjectively back that out.

22        Q.    Presumably, the cost of living is

23   significantly less --

24        A.    Yes.

25        Q.    -- around Oxford, Ohio, than it is in New

Roger Jenkins (8/7/17)

Page 34

1   York?

2        A.      Yes, but not much difference, perhaps,

3   than it is at William and Mary, for example.

4        Q.      All right.  I understand.

5                Now, do you remember specifically the large

6   raises that were given to professors Nixon and Shrider in

7   the 2012-13 timeframe?

8        A.      No, I have no recall of any raises to any

9   faculty in that timeframe.

10       Q.      Did you generally go along with the

11  recommendations that were made to you by your associate

12  deans?

13       A.      In general, yes.

14       Q.      How frequently would you overrule?

15       A.      Rarely.  Rarely.

16       Q.      Once every ten years, once a year, once

17  every --

18       A.      Once every four years.

19       Q.      Once every four years?

20       A.      I'm a -- I was a leader who believed in

21  delegating and delegating fully, and asking questions

22  to make sure they followed the process correctly and

23  made good decisions.  I wasn't second-guessing

24  decisions, I was trying to make sure they felt good

25  about their decisions.

Roger Jenkins (8/7/17)

Page 35

1    Q.    Now, were you personally familiar with

2 Professor Kelly Brunarski as a teacher?

3    A.    No, I wasn't.

4    Q.    Were you personally familiar with

5 Professor Yvette Simpson as a teacher?

6    A.    No, I wasn't.  I never sat in their

7 classrooms and I was not familiar with them as

8 teachers.

9         MS. CORL:  For purposes of the record,

10 counsel said "Simpson," but it's Harman.

11         MR. CROSKERY:  I meant Harman.  I was

12      thinking of Betty Simpson because she was running

13      for city council, and she was on the news this

14      morning.

15 BY MR. CROSKERY:

16    Q.    Harman.  Were you familiar with Yvette

17 Harman?

18    A.    No.

19    Q.    It shows I shouldn't be reading while I'm

20 talking.

21         Well, I guess this next question, I have to

22 give you a little background information.  I want you to

23 assume for a moment, because it's factual, that Professor

24 David Shrider and Professor Terry Nixon each received

25 double-digit raises of approximately 16 percent in 2012.

Gibson Court Reporting
865-546-7477

Roger Jenkins (8/7/17)

Page 36

1              Now, as I understand it, normally raises

2       above a certain magnitude have to get higher-level

3       approval.  Do you recall having any input on approving

4       larger raises for Professor Shrider and Professor Nixon?

5            A.      I have no recall of giving any special

6       approval.

7            Q.      Can you tell me what type of reasoning

8       there would be for such an approval, assuming that you

9       gave it?

10              MS. CORL:  Objection, calls for

11           speculation.  The witness can answer if he

12           remembers.

13              THE WITNESS:  Ask the question again.

14      BY MR. CROSKERY:

15           Q.      I just want to know what would, in your

16      background and experience, justify giving a raise of

17      that magnitude.

18           A.      Exceptional performance.

19           Q.      Based on the same things we talked about?

20           A.      Exceptional performance.  Marketability,

21      didn't want to lose the faculty.  Identical.  And I

22      would be surprised, interested to see, I have no idea;

23      but in that same year if we had monies like that,

24      double digit, I would expect you'd see a similar

25      percentage perhaps at other places as well, unless

Roger Jenkins (8/7/17)

Page 37

1  finance was just that low.  Finance was always low, and

2  it could have been -- it could have been that low, but

3  I'd be a bit surprised if you didn't see some -- a

4  larger performance -- larger performance raises

5  elsewhere, too.

6      Q.      Were large performance raises of that

7  magnitude something that had to be approved by the

8  provost's office?

9      A.      I don't -- I don't recall.  I really

10  don't recall.  I don't recall.  It would surprise me if

11  they would be, I guess, but I don't remember.

12      Q.      Normally speaking, if you have a large

13  raise of that magnitude, a double-digit raise, is there

14  normally a written justification that's provided for

15  it?

16      A.      I -- I don't recall.  I would expect that

17  it'd be the same justification for giving any raise.

18  Every raise that was given had to have a justification.

19      Q.      All right.

20      A.      There didn't have to be a

21  super-justification for a super-raise.

22      Q.      All right.  So if I understand the

23  process correctly, you're saying that when you're

24  making faculty salary decisions that every single one

25  of them had some sort of written statement that was

Roger Jenkins (8/7/17)

Page 38

1    given to you by whom?

2          A.      By the senior associate dean.

3          Q.      So the senior associate dean wrote it

4    out?

5          A.      He would have a paper which would have

6    faculty, which would have data, which would have the

7    case for his decision, for his logic.

8          Q.      So then did you and he have a meeting in

9    which he laid out --

10         A.      Absolutely.

11         Q.      All right.  And he was reading from

12   summaries?

13         A.      He was showing me his summaries.

14         Q.      All right.  He was showing you written

15   summaries?

16         A.      Yes.

17         Q.      And those written summaries would have on

18   them things like teaching awards, whether or not

19   they've taught internationally, what their student

20   teaching effectiveness is based on evaluations and

21   based on this informal database, and then what else?

22         A.      Research and scholarship.

23         Q.      All right.  And research and scholarship?

24         A.      Uh-huh.

25         Q.      Based on what tier they had been in and

Roger Jenkins (8/7/17)

Page 39

1  so forth?

2      A.      This person had a hit in the Journal of

3  Economics, and Miami's had one of those in the last 20

4  years.  That's a pretty important piece of data.

5      Q.      The Journal of Economics?

6      A.      I'm making that up.

7      Q.      Okay.  Yeah.

8              All right.  Now, was there any policy of

9  basing salary increases on a faculty member's willingness

10  to teach during summer and/or January terms?

11      A.      Zero, to my knowledge.  The summers were

12  theirs, belonged to the faculty for research and

13  scholarship time.  Encouragement was given to them to

14  keep that time and use it that way, not to teach.

15      Q.      Were there factors that you wanted to use

16  in making raises, both ordinary raises and super-merit

17  raises, that we have not yet discussed?

18      A.      No, not to my knowledge.

19      Q.      Were you familiar with the Finance

20  Department chair, Steve Wyatt?

21      A.      Yes.

22      Q.      Did his recommendations play a role --

23      A.      Yes.

24      Q.      -- in determining --

25      A.      Yes.

Roger Jenkins (8/7/17)

Page 40

 1      Q.      And let me finish my whole question, just
 2   so it's clear on the record.
 3      A.      Okay.
 4      Q.      Did his recommendations play a role in
 5   making the salary decisions?
 6      A.      Yes.
 7      Q.      A large role?
 8      A.      As -- as important as would any
 9   department head.
10      Q.      And how important is that, exactly?
11      A.      Very important.
12      Q.      So 90 percent of the decision, 85?
13      A.      I'd say it's close to 90, 95.
14      Q.      So we didn't go through that step yet.
15   Ray Gorman or Tim Krehbiel in this timeframe sits down
16   with you and says, "Here is the written data that
17   justifies why I want to give this particular raise to
18   this particular professor."
19              Was there also a component in there for
20   the recommendations of the Finance Department chairman?
21      A.      Yes, that would be an important part of
22   Tim's -- what he brought to the table.
23      Q.      All right.  And what format was that in?
24   Would that be something that was also written down --
25      A.      No.

Roger Jenkins (8/7/17)

Page 41

1     Q.      -- or that would be him telling you, "The

2    Finance Department chair recommended the raise?"

3     A.      Yes.  And I would be surprised -- I don't

4    recall.  I would be surprised if that wasn't also

5    written down.  I don't recall, but I would be very

6    surprised if it also wasn't specifically written down.

7              Because the department head's

8    recommendation, since they are the closest to the

9    faculty and closest to knowing, their weight was

10   always, always -- you know, you just didn't go against

11   them unless there's really evidence of wrongdoing.

12    Q.      All right.  I'm going to represent to you

13   that Dr. Krehbiel has given an affidavit and also given

14   some deposition testimony, and in that deposition and

15   affidavit testimony that he represented that Steve

16   Wyatt -- department chair Steve Wyatt had recommended

17   the market adjustment raises be awarded to, among

18   others, faculty members Yvette Harman, Kelly Brunarski,

19   Terry Nixon, and David Shrider.  Okay?

20              Now, you've already said that you don't

21   have particular recall of those things.  But assuming

22   for a moment that the department chair had made those

23   recommendations, do you recall Tim Krehbiel singling

24   out professors Nixon and Shrider and saying they should

25   be given larger raises?

Roger Jenkins (8/7/17)

Page 42

1      A.      I do not have any such recall.

2      Q.      And assuming that Dr. Krehbiel does not

3    remember how you and he came to the final dollar

4    amounts, it's fair to say you don't remember either?

5      A.      I do not.

6      Q.      Okay.  But was it your final decision on

7    the recommended amounts?

8      A.      It always is.  The dean always has

9    responsibility for the final decision.

10      Q.      All right.

11      A.      And so whatever the final decision was, I

12    was comfortable.

13      Q.      One thing that you had mentioned as part

14    of determining faculty salary increases that we haven't

15    talked about yet is other things like community

16    involvement.  Can you give me an example of some of the

17    things that would factor in that we haven't discussed

18    yet?

19      A.      That miscellaneous category may be, for a

20    faculty member, 5 percent of 100, maybe 0 percent,

21    maybe 10 percent.

22              One example, each summer we -- Miami had

23    a program where its entering freshmen would come for

24    orientation for two or three days, and that required

25    faculty presentations as part of the orientation.

Roger Jenkins (8/7/17)

Page 43

1          So if faculty members spent an unusual

2     amount of hours prepping for that and fulfilling that

3     responsibility that may have been counted partially, you

4     know, something 1 percent, 2 percent of that final

5     evaluation.

6          If they were similarly good citizens in

7     that they chaired for three years in a row one of the

8     more important standing committees in the business

9     school, that would be one example of where service to the

10    business school, service to the institution.

11          If a faculty member was president of a

12    national or international professional organization for

13    three years, that'd be one evidence of service to the

14    profession that may have been counted a slight bit.

15          So that other -- you know, that other 5

16    percent, 3 percent, 7 percent would be unusual service

17    beyond the call of duty in the business school or at the

18    university or in their professional organizations.

19    Q.     Would obtaining a $100,000 grant or study

20    for the Department of Homeland Security, for example,

21    be something that could be in that category?

22    A.     That could be something that would be in

23    that category, yes.

24    Q.     And is it fair to say that that

25    particular category is something that the professor

Roger Jenkins (8/7/17)

Page 44

1  himself or herself gives some input on to their dean --

2  let me back up, because I'm not asking this question

3  very well.

4          How do you know about this other service

5  category?

6          A.      Each year, every professor completes a

7  very lengthy activities sheet which shows everything

8  from teaching -- from the courses they taught, the

9  number of students in each course; every committee

10  they've served on within the business school, within

11  the university; every activity they're engaged in in

12  terms of scholarship and research; any grant activity.

13          Any activity at all, the faculty

14  self-reports that, and it goes to the department head

15  to be considered as part of their package, their

16  evaluation for performance.

17          Q.      So one of the purposes of the activities

18  sheet is indeed to help determine salary?

19          A.      Is to help determine the performance and

20  the activities of the professor, yes.

21          Q.      Which is then used to help determine

22  salary?

23          A.      Ultimately, yes.

24          Q.      All right.  Do you recall making a

25  decision in the 2012 timeframe to want to aggressively

Roger Jenkins (8/7/17)

Page 45

1    use super-merit money to differentiate faculty members

2    who in the past several years had met teaching and

3    research excellence criteria?

4         A.       Ask your question again.

5         Q.       Do you recall in the 2011 to 2012

6    academic year that you received -- at the end of it

7    received a pool of super-merit money and that you made

8    a decision that you wanted to aggressively use that

9    super-merit money to differentiate those faculty

10   members who in the past several years demonstrated that

11   they met the criteria of teaching excellence,

12   recognition awards, and exceptional performance and

13   research during the past several years?

14        A.       I recall that any year -- not that year

15   in particular, but any year in which we had extra merit

16   money it was always used in the same manner; to make

17   sure that we kept our very best faculty and they not

18   leave, by keeping them as close to the market as we

19   could.  That was always the criteria.

20        Q.       Do you know whether or not any other

21   schools in the 2012 timeframe were reaching out to

22   obtain Professor Nixon?

23        A.       I have no idea.

24        Q.       Whether any other schools were reaching

25   out to obtain Professor Shrider?

Roger Jenkins (8/7/17)

Page 46

1      A.      I have no idea.  My philosophy always was

2    not to wait until a faculty came to me with an offer.

3    I didn't look at that favorably.  My philosophy was

4    always to try to make sure our best faculty were paid

5    and appreciated, and they were told so, so they didn't

6    need to look elsewhere.

7      Q.      I need to go into kind of a sensitive

8    subject, which it may be for you, and I'll try to

9    confine my questions to what's relevant to this.  I

10   want to talk a little bit about the Petters situation.

11   Particularly, I'm interested in whether or not any of

12   the trips that you made to China where you had a chance

13   to see some Miami University professors teaching also

14   involved efforts to sell Polaroid.

15     A.      No.

16     Q.      So those were separate trips?

17     A.      Absolutely.

18     Q.      What about the relationships that were

19   developed?  Were there any relationships that you had

20   developed while you were in China working on your

21   university and college connections that were also used

22   in your Petters relationship?

23     A.      No.

24     Q.      So you were going to different places and

25   talking to different people?

Roger Jenkins (8/7/17)

```
                                                  Page 47
 1       A.      I didn't make trips to China for Polaroid

 2  business.

 3       Q.      Then how were you selling it?

 4       A.      I was never selling Polaroid.

 5       Q.      What were you selling?

 6       A.      I wasn't selling anything.  I served as a

 7  consultant to the Petters organization.

 8       Q.      All right.  When you were serving as a

 9  consultant, did you develop any relationships with

10  individuals in China?

11       A.      No.

12       Q.      Did the Petters situation play a role in

13  your leaving Miami University?

14       A.      Yes.

15       Q.      Tell me about that.  What was the

16  situation?

17              MS. CORL:  I'm going to object to the

18       relevance of all of these questions.  Totally

19       irrelevant.

20              THE WITNESS:  You know, I was past

21       retirement age.  And when the Petters situation

22       evolved, my decision was to simply retire probably

23       earlier than I would have liked to have, or I

24       would have, to save the university and myself a

25       lot of public scrutiny.
```

Roger Jenkins (8/7/17)

Page 48

1           But I also want to add to this I have

2    never been accused of doing anything wrong in the

3    Petters situation, and I have never done anything

4    wrong legally, morally, or any other way.

5           But I regret actually retiring early.  I

6    can say that.  I regret it.  I wish I'd stayed.

7    If I'd stayed I could not have been let go, number

8    one, because I had done nothing wrong.

9           Number two is, I would have taken the

10   Petters organization to court -- I mean, I would

11   have taken the collecting, whatever you call that,

12   those guys that were trying to get back my

13   consulting money.  I would have taken them to

14   court and not paid back what I wound up doing.

15          So I made a bad decision, I think, in

16   retiring early, because at the end of the day it

17   left -- it left impressions that I had done

18   something wrong, and I did not.

19          I have never done anything wrong, either

20   legally or morally.  And the Petters case is

21   simply one of those in which there was a -- there

22   was a feeling obviously that that was the case,

23   but it was never the case.

24   BY MR. CROSKERY:

25          Q.    All right.  So you resigned to spare the

Roger Jenkins (8/7/17)

Page 49

1    university?

2        A.      No, I retired.

3        Q.      Retired.

4        A.      Big difference.

5        Q.      You retired?

6        A.      Big difference.

7        Q.      You retired early to spare the university

8    any embarrassment associated with the taint of the

9    Petters situation?

10       A.      That's right.  I had worked for 13 years

11   and built a magnificent business school and taken it to

12   a Top-25 ranking.  And I was willing to self-sacrifice

13   the embarrassment to have the school retain the shine

14   it always had.  That was a decision of self-sacrifice,

15   not a decision of having done anything wrong.

16       Q.      Commendable.  But when you first came to

17   Miami University where was it ranked, the business

18   school?

19       A.      52, 53.

20       Q.      So you raised it essentially from a --

21       A.      My team and I went from a 50 to a Top 25.

22   Rarely happens.  That's what drew me to Miami, was that

23   opportunity, from Wake Forest.  I never, ever thought I

24   would leave Wake Forest, because it was the best school

25   I'd ever been to and I was happy there.  But the

Roger Jenkins (8/7/17)

Page 50

1    opportunity to take a school and build it and build a

2    brand-new school, those opportunities don't come around

3    very often for leaders.

4            MR. CROSKERY:  You have an outstanding

5        debate team, too.

6            THE WITNESS:  Yes.  Are you a Miami

7        graduate?

8            MR. CROSKERY:  No, Wake Forest.

9            THE WITNESS:  Oh, Wake Forest?

10           MR. CROSKERY:  I spent a year there

11       before I went to the military academy.

12           THE WITNESS:  It's a great school.

13           MR. CROSKERY:  Let's take another short

14       break while I speak to my clients briefly.  I

15       apologize for having to do it.  Actually, let's

16       make it a little bit longer, in case anybody needs

17       to freshen up or something.

18           Ms. CORL:  Let's not, if we could.  I

19       have a long drive ahead of me.

20           MR. CROSKERY:  Well, so do I.  The same

21       long drive as you, probably.

22           MS. CORL:  Okay.  I doubt it.  I'm going

23       to Cincinnati.

24           THE WITNESS:  What time is it now?

25           MR. CROSKERY:  It's about 9:10.  Let's

Roger Jenkins (8/7/17)

Page 51

1          reconvene in about 10 minutes.

2                   (Recess at 9:14 a.m. 9:20 a.m.)

3     BY MR. CROSKERY:

4          Q.     Let's go back on the record.  I've gone

5     through most of the things I wanted to go through, but

6     I wanted to go back and pick up one thing.

7                   You mentioned that some -- some

8     consideration was given to faculty that would do things

9     like orientation and give some extra time to the

10    university.  First of all, were the faculty notified

11    that this was something that would be used?

12         A.     Service, yes.  Faculty knew that the

13    service category was always there and was used, yes.

14         Q.     So this is -- how were they notified?  Is

15    that that initial letter that goes out when somebody is

16    newly hired?

17         A.     I don't know.  I'm not sure how they were

18    notified, but the recognition and the awareness and the

19    Ten Commandments were there.

20         Q.     Let's go back to teaching orientation, in

21    particular.  How were the faculty selected for that?

22         A.     The assistant dean, Marti Kyger, made

23    those selections.

24         Q.     Do you know what the assistant dean used

25    to make those selections?

Roger Jenkins (8/7/17)

Page 52

1      A.      I would suspect that she chose the best

2   teachers.  I would suspect that's what she did.

3      Q.      That makes sense.

4      A.      Yes.

5      Q.      All right.  And is your reason for

6   suspecting that based on your knowledge and experience?

7      A.      Based on who she had each year doing

8   that.

9           MR. CROSKERY:  All right.  I appreciate

10       it.  I don't have any further questions.

11           MS. CORL:  Thank you.  He'll read.

12        (Proceedings concluded at 9:22 a.m.)

13         FURTHER THIS DEPONENT SAITH NOT.

14

15

16

17                    _____

                      ROGER JENKINS

18

19                    _____

                      NOTARY PUBLIC

20                    MY COMMISSION EXPIRES:_____

21

22

23

24

25

1          C E R T I F I C A T E

2   STATE OF TENNESSEE

3   COUNTY OF KNOX

4          I, Rhonda S. Sansom, RPR, CRR, CRC, Licensed

5   Court Reporter, do hereby certify that I reported in

6   machine shorthand the deposition of ROGER JENKINS,

7   called as a witness at the instance of the Plaintiffs;

8   that the said witness was duly sworn by me; that the

9   reading and subscribing of the deposition by the

10  witness was not waived; that the foregoing pages were

11  transcribed under my personal supervision and

12  constitute a true and accurate record of the deposition

13  of said witness.

14         I further certify that I am not an attorney or

15  counsel of any of the parties, nor an employee or

16  relative of any attorney or counsel connected with the

17  action, nor financially interested in the action.

18         Witness my signature this the 7th day of

19  August, 2017.

20

21  _____
    Rhonda S. Sansom, RPR, CRR, CRC
22  Tennessee LCR# 0685
    Expiration Date:  6/30/18
23  rhondasansom@gibsonreporters.com
    2017.08.25 14:22:26
24  Signer:                          Illinois Licensed Certified
    E=rhondasansom@gibsonreporters.com   Shorthand Reporter
                                     No. 084.004823
25                                   Expiration Date:  5/31/19

**Gibson Court Reporting**

Roger Jenkins (8/7/17)

Page 54

1                    DEPOSITION ERRATA SHEET

2

3    Page No._____ Line No._____ Change to:_____

4    Reason for change: _____

5    Page No._____ Line No._____ Change to:_____

6    Reason for change: _____

7    Page No._____ Line No._____ Change to:_____

8    Reason for change: _____

9    Page No._____ Line No._____ Change to:_____

10   Reason for change: _____

11   Page No._____ Line No._____ Change to:_____

12   Reason for change: _____

13   Page No._____ Line No._____ Change to:_____

14   Reason for change: _____

15   Page No._____ Line No._____ Change to:_____

16   Reason for change: _____

17   Page No._____ Line No._____ Change to:_____

18   Reason for change: _____

19   Page No._____ Line No._____ Change to:_____

20   Reason for change: _____

21   Page No._____ Line No._____ Change to:_____

22   Reason for change: _____

23

24   SIGNATURE:_____ Date: _____

25   PRINT WITNESS NAME:_____

Roger Jenkins (8/7/17)

Page 55

 1                    DEPOSITION ERRATA SHEET

 2

 3   Page No._____ Line No._____ Change to:_____

 4   Reason for change: _____

 5   Page No._____ Line No._____ Change to:_____

 6   Reason for change: _____

 7   Page No._____ Line No._____ Change to:_____

 8   Reason for change: _____

 9   Page No._____ Line No._____ Change to:_____

10   Reason for change: _____

11   Page No._____ Line No._____ Change to:_____

12   Reason for change: _____

13   Page No._____ Line No._____ Change to:_____

14   Reason for change: _____

15   Page No._____ Line No._____ Change to:_____

16   Reason for change: _____

17   Page No._____ Line No._____ Change to:_____

18   Reason for change: _____

19   Page No._____ Line No._____ Change to:_____

20   Reason for change: _____

21   Page No._____ Line No._____ Change to:_____

22   Reason for change: _____

23

24   SIGNATURE:_____ Date: _____

25   PRINT WITNESS NAME:_____