KELLY BRUNARSKI, et al.,                              Civil Action No. 1:16-cv-311

    Plaintiffs,                                      Dlott, J.
                                          Bowman, M.J

   vs.

MIAMI UNIVERSITY,

    Defendant.

## REPORT AND RECOMMENDATION

Plaintiffs Kelly Brunarski and Yvette Harman (collectively, "Plaintiffs"), filed this civil action against their employer, Defendant Miami University ("Miami") on February 15, 2016. After filing two amended complaints, Plaintiffs' sole claim for relief against Miami is for gender discrimination in the payment of wages under the Equal Pay Act ("EPA"), 29 U.S.C. § 206(d)(1). (Doc. 22, PageId 97). Plaintiffs, who are female, specifically claim that they were paid less than two male comparators since approximately 2012. (*Id.*, PageId 94-96).

Following the conclusion of discovery, Miami moved for summary judgment. (Doc. 48). Plaintiffs have filed a response in opposition and Miami has filed a reply. (Docs. 69, 71). Pursuant to local practice, this matter has been referred to the undersigned magistrate judge for a report and recommendation on Miami's motion for summary judgment. For the reasons set forth herein, Miami's motion should be denied.

## I.    SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56(a) provides that summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the

movant is entitled to judgment as a matter of law." A dispute is "genuine" when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A court must view the evidence and draw all reasonable inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The moving party has the burden of showing an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

Once the moving party has met its burden of production, the nonmoving party cannot rest on the pleadings, but must present significant probative evidence in support of their case to defeat the motion for summary judgment. *Anderson*, 477 U.S. at 248-49. The mere scintilla of evidence to support the nonmoving party's position will be insufficient; the evidence must be sufficient for a jury to reasonably find in favor of the nonmoving party. *Id.* at 252.

In reviewing the evidence in the context of a motion for summary judgment, courts generally cannot consider inadmissible hearsay. *See, e.g., Alpert v. United States*, 481 F.3d 404, 409 (6th Cir. 2007); *North American Specialty Ins. Co. v. Myers*, 111 F.3d 1273, 1283 (6th Cir. 1997). However, the Federal Rules of Evidence contain many exceptions to the hearsay rule. For example, a statement offered against an opposing party and made by that party's agent or employee on a matter within the scope of that relationship and while it existed is not considered hearsay. *See Kelly Serv., Inc. v. Creative Harbor, LLC*, 846 F.3d 857, 867 (6th Cir. 2017) (citing Fed. R. Evid. 801). In addition, under Fed. R. Civ. P. 56(c), a party may cite to deposition testimony, discovery responses, affidavits, or other documents or materials to establish

the absence or presence of a genuine dispute of material fact, or to show that the adverse party cannot produce admissible evidence, notwithstanding any hearsay issues, so long as the same evidence could be presented in an admissible form at trial.[1] If a party fails to properly support an assertion of fact or fails to properly address an opposing party's assertion of fact as required by Rule 56(c), the court may allow an additional opportunity to properly support or address the fact, or the court may consider the fact undisputed for purposes of the motion. Fed. R. Civ. P. 56(e).

## II.     FACTS AND BACKGROUND

Pursuant to Fed. R. Civ. P. 56 and the Standing Orders on Civil Procedures of the undersigned and the district judge, Miami filed Proposed Undisputed Facts (Doc. 68), to which Plaintiffs filed a response (Doc. 69-16). Some of the material facts have been deemed undisputed by the parties. Where a conflict exists and Plaintiffs have cited to admissible evidence, the undersigned has construed the disputed material facts in favor of Plaintiffs, as the non-moving party.

### A. Miami's Processes for Determining Base Salary Raises for Finance Professors in the Farmer School of Business

Miami's academic year consists of the Fall Term and Spring Term. (Doc. 69-1, Harman Affidavit, PageId 1544). All of the Associate Professors of Finance have standard nine-month contracts for the academic year that cover the base salary. (*Id.*). The base salary does not include compensation for teaching study-abroad programs, workshops, courses in the Professional MBA Program, or Winter and Summer Term courses. (*Id.*). These activities are not performed during the standard nine-month

---

[1] For example, although affidavits would otherwise constitute hearsay, Fed. R. Civ. P. 56(c)(4) requires affidavits or declarations to be based upon personal knowledge and to set forth only those facts that would be admissible in evidence.

academic year. (*Id.*). Teaching classes during the Summer and Winter terms and overload classes is a choice based on seniority and availability. (*Id.*). Extra teaching income increases the monthly retirement stipend received through STRS, which is based on the average of a faculty member's five highest salary years, including overloads. (*Id.*). Teaching awards also come with a separate monetary stipend and are not included in base salary. (*Id.*, PageId 1543).

The setting of base salary for faculty in the Farmer School of Business ("FSB") is a multi-tiered annual process. (Doc. 68, PageId 1517 and Doc. 69-19, PageId 1687) (citing Doc. 48-1, FSB Select Finance Faculty Increments Chart, PageId 654). A University-wide compensation pool provides merit pay increases for all faculty members of the University. (*Id.*). The annual merit pay increases are awarded by the Department Chair, and approved by the Dean of each individual school within the University. (*Id.*).[2] During years when funds are available, there also are "super-merit" base salary adjustments that are awarded to faculty. (*Id.*).

For the annual merit pay increases, professors are evaluated in three categories: teaching, research and service. (Doc. 49-1, Wyatt Dep., PageId 689; Doc. 49-2, Gorman Dep., PageId 775; Doc. 50-1, Callahan Dep., PageId 832-33; Doc. 65-1,

---

[2] For the sake of clarity throughout this Report and Recommendation, the undersigned sets forth the position titles and general timeframes of employment by Miami for various individuals upon which the parties rely in support of their positions: (1) Steve Wyatt, Chair of the Finance Department from September 2006 through May 2015 (Doc. 49-1, PageId 687); (2) Timothy Krehbiel, Senior Associate Dean of the FSB from July 1, 2010 to December 31, 2013 (Doc. 48-1, PageId 663); (3) Roger Jenkins, Dean of the FSB from approximately 2000 through 2013 (Doc. 65-1, PageId 1368, 1385); (4) Raymond Gorman, a long-time member of Miami's Finance Department faculty, the Senior Associate Dean of the FSB from 2004 to approximately 2010, Associate Provost from 2010 to 2013 and from February 2015 to June 2015, and interim Dean of the FSB from 2013 to 2014 (Doc. 49-2, PageId 766-67); (5) Matt Myers, Dean of the FSB since May 1, 2014 (Doc. 51-1, PageId 876); (6) Phyllis Callahan, a long-time member of Miami's faculty, the former interim Dean and Dean of the College of Arts & Sciences, and the current Provost since February 2015 (Doc. 50-1, PageId 826-27); and (7) Rebecca Luzardis, a former faculty member in the Department of Management and the Interim Chair of the Finance Department since July 1, 2016 (Doc. 52-1, PageId 990-91).

Jenkins Dep., PageId 1369). Generally, teaching and research are weighted equally (40%) and service is weighted less (20%). (Doc. 49-1, PageId 690; Doc. 49-2, PageId 775; Doc. 65-1, PageId 1370). For teaching, there are multiple measures of teaching effectiveness, but "the obvious one" is the Student Evaluations of Teachers ("SETs"). (Doc. 49-2, PageId 776); see also (Doc. 49-1, PageId 694; Doc. 50-1, PageId 832-83). Indeed, when the professors set forth their annual justifications for their evaluations, the SETs are the only mandatory factor for teaching effectiveness that must be included. (Doc. 50-1, PageId 846-47). The SETs for the FSB typically consisted of Questions 1 through 8 ("Q1-Q8") on specific teaching effectiveness subjects and Question 9 ("Q9") on the overall rating of the professor. (Doc. 49-1, PageId 698-99, 753). Other measures of teaching effectiveness could include teaching awards and invitations to teach in special situations that showcased the university. (Doc. 65-1, PageId 1370-71, 1373).[3] Teaching awards came with a financial stipend to the professor. (Doc. 65-1, PageId 1373; Doc. 69-1, PageId 1543; Doc. 69-9, PageId 1562). Winning a teaching award requires strong support from the department representative on the Teaching Effectiveness Committee. (Doc. 69-9, PageId 1563). The Finance Department's representatives on the Teaching Effectiveness Committee have been male professors in the department and have included Terry Nixon, David Shrider, and Thomas Boulton. (Id., PageId 1564). Teaching awards such as the Smucker Teaching Award are based in part on SETs and recommended by the Teaching Effectiveness Committee. (Id., PageId 1562; Doc. 69-10, Smucker Teaching Award Guidelines, PageId 1568-72). Brunarski recalls that during a FSB Women's Breakfast in spring semester of 2016,

---

[3] Although Jenkins testified that international teaching may be considered as part of teaching effectiveness (Doc. 65-1, PageId 1370-71, 1373), Provost Callahan testified that teaching international courses does not affect an evaluation of teacher effectiveness (Doc. 50-1, PageId 865).

Professor Oakenfull, who served on the Teaching Effectiveness Committee, stated that the committee members only wanted to consider the SET rating for Q9 and that anyone raising the issue of gender bias in SET scores was labeled a "Femi-Nazi." (Doc. 69-9, PageId 1562).[4]   Although the Smucker Teaching Award is a FSB-wide award, no female professor in the Finance Department has received a Smucker Teaching Award since at least 1999. (Id., PageId 1563).

SETs also may have been relied upon in conjunction with informal verbal feedback from students about a professor's class and teaching effectiveness when deciding which professors to invite to participate in international teaching opportunities. (Doc. 65-1, PageId 1376, 1389-92).[5]   The professors for the study-abroad program also were selected by Professor Sullivan who had a reputation for running roughshod over subordinates, particularly women, and who favored the male professors over the female professors. (Doc. 69-9, PageId 1564).[6]   Jenkins, the Dean of the FSB through 2013, was unaware of any policy basing salary increases on a faculty member's willingness to

---

[4] Provost Callahan corroborates that the breakfast occurred, that the breakfast entailed discussions about student teaching evaluations, and that Professor Oakenfull spoke at the breakfast (Doc. 50-1, PageId 841-42, 854), but did not corroborate Professor Oakenfull's specific comments. Plaintiffs have provided no corroboration of the alleged comments through the testimony or affidavit of the referenced professor or any documentation pertaining to the same. Federal Rule of Evidence 801(d)(2)(d) allows admission of that evidence as non-hearsay, however, to the extent it is "made by a party's agent or employee on a matter within the scope of that relationship and while it existed."

[5] The Professional MBA Program and Summer Business Institute also are "invitation only." (Doc. 69-1, PageId 1545). Plaintiffs have not been invited to teach these courses. (Id.).

[6] Brunarski's affidavit also references a 2007 article authored by a former member of the Finance Department about experiences she had while in the Finance Department that is relied upon to show a contentious environment within the Finance Department for female professors. (Doc. 69-9, PageId 1563). To the extent the statements made in that article are offered to prove the truth of the matters asserted, they constitute hearsay for which no obvious exception applies. If, however, they are offered not for their truth but to establish motive for the alleged actions of the P&T committee and comments of the finance professor with respect to Brunarski's tenure decision, then they may be admissible as non-hearsay. Moreover, the comments of the finance professor may constitute non-hearsay under Fed. R. Evid. 801(d)(2)(d). Nonetheless, a direct connection between this article, the comment, and the award of the 2012 super-merit raises has not been established; it is an isolated circumstance remote in time from the 2012 super-merit raises that is not alleged to have involved any decisionmakers for the 2012 super-merit raises.

teach in the Summer or Winter terms. (Doc. 65-1, PageId 1401).[7] Jenkins testified that faculty members are encouraged to use that time for research and scholarship. (*Id.*).

For research, both the quantity and the quality of the publications are important. (Doc. 65-1, PageId 1386-88). Also important are the "impact of the publications, where the publication appeared, [and] rankings of journals" in which publications appeared. (*Id.*, PageId 1386).

As for service to the university, it could include, *inter alia*, time spent for faculty presentations during orientation, chairing a committee in the business school, or being a president of a national or international professional organization. (Doc. 65-1, PageId 1405). Service is self-reported by the faculty member each year as part of the package for performance evaluations. (*Id.*, PageId 1406).

In some years, the FSB has extra money that is used for "super-merit" raises. (Doc. 65-1, PageId 1385). According to Jenkins, the criteria used for "super-merit" raises was the same criteria used for the annual merit raises. (*Id.*, PageId 1368, 1385). The raises were allocated to top faculty to bring them closer to the market rate, as the university typically had been at the low end of pay for the FSB. (*Id.*, PageId 1385). However, according to Timothy Krehbiel, the Senior Associate Dean of the FSB from July 1, 2010 to December 31, 2013, the criteria determined by Jenkins and utilized by Krehbiel for the 2012 super-merit raises included "involvement in FSB study abroad programs, exceptional performance in teaching as demonstrated through significant accomplishments, recognition and awards, and exceptional performance in research as demonstrated by significant accomplishments, recognition and awards." (Doc. 48-1, Krehbiel Affidavit, PageId 663). Krehbiel avers that Jenkins wanted to "aggressively

---

[7] This is consistent with Provost Callahan's testimony. (Doc. 50-1, PageId 865).

use the money to differentiate those faculty members who in the past several years met one or more of the above three criteria" and that the criteria examined for the raises did not include any analysis or review by Krehbiel of SETs of faculty members. (*Id.*, PageId 663).

### B. Plaintiffs' Professional Background at Miami

Brunarski was hired by Miami as an Associate Professor of Finance in the FSB in 1999 and was tenured in 2006. (Doc. 69-15, Brunarski Dossier Excerpt, PageId 1675). In her position, she has taught courses in corporate finance, bank management, and business finance and investments. (*Id.*). In the Summer of 2006, Brunarski received the American Banker Association Fellowship to attend the Stonier Graduate School of Business, which was one of two such annual fellowships awarded nationwide. (*Id.*, PageId 1676). In October 2008, she delivered a lecture on *Corporate Payout Policy* for the American Finance Professional Conference. (*Id.*). She has attended multiple workshops and seminars for professional growth. (*Id.*, PageId 1679). Her service to the profession has included refereeing for multiple professional journals and serving on professional program committees. (*Id.*, PageId 1680). Her service to the university has included, *inter alia*, authoring the departmental assessment report, serving on and chairing the finance faculty search committee, acting as a faculty mentor, and serving on multiple departmental, divisional, and university committees. (*Id.*). According to a recognized source of top tier publications in finance journal rankings, Brunarski has had three publications in "A" ranked journals and two publications in "A-" journals, and a total of six publications since tenure. (Doc. 69-9, Brunarski Affidavit, PageId 1564, citing Doc. 22, Second Amended Complaint, PageId 94). As of October 27, 2015, she had

765 citations on Google Scholar, including 363 citations since 2010. (Doc. 22, PageId 94). She also had 153 Thompson-Reuters (SSCI) expanded citations. (*Id.*). She has been selected by outside agencies for honors such as the Higher Education Mentorship Initiative, sponsored by the University of Cincinnati. (*Id.*) Prior to the 2012 super-merit raises, she received multiple accolades for her teaching, as reflected by student comments in her dossier excerpt. (Doc 69-15, PageId 1676). In her SET scores, Brunarski has received lower ratings on Q1 through Q8 and on Q9 (overall rating) than Terry Nixon and David Shrider, two male professors in the Finance Department. (Doc. 48-1, PageId 661).

Harman was hired by Miami as an Assistant Professor of Finance in the FSB in 2000 and was tenured as an Associate Professor of Finance in 2006. (Doc. 69-3, Harman Dossier Excerpt, PageId 1548). In her position, she has taught courses concerning investments and corporate finance. (*Id.*). For the period from 2009 to 2011, she received a $1 million research grant from the Department of Homeland security in conjunction with the Center for Business Excellence and OARS, for which she was the principal investigator. (*Id.*, PageId 1549). She has attended multiple workshops and seminars for professional growth. (Doc. 69-1, Harman Affidavit, PageId 1545). According to a recognized source of top tier publications in finance journal rankings, Harman has had one publication in an "A" ranked journal and two publications in "A-" journals, and a total of seven publications since tenure. (*Id.*, PageId 1544, citing Doc. 22, Second Amended Complaint, PageId 95). As of October 27, 2015, she had 316 citations on Google Scholar, including 193 citations since 2010. (Doc. 22, PageId 95). She also had 48 Thompson-Reuters (SSCI) expanded citations. (*Id.*). She has been

selected by outside agencies for honors such as the External Tenure and Promotion Review Committee for the University of New Hampshire. (*Id.*). In her SET scores, Harman has received lower ratings on Q1 through Q8 and on Q9 (overall rating) than Terry Nixon and David Shrider, two male professors in the Finance Department. (Doc. 48-1, PageId 661).

### C. Male Comparators' Professional Backgrounds at Miami

Plaintiffs have identified two male tenured Associate Professors of Finance in Miami's FSB as comparators, David Shrider and Terry Nixon.

Shrider was hired by Miami as an Assistant Professor of Finance in the FSB in 2004 and was later tenured as an Associate Professor in or about 2010. (Doc. 71-1, PageId 1720). In his position, he has taught courses in international business finance, investments, managerial finance, capital acquisition, and corporate finance. (*Id.*, PageId 1722). He received the Smucker Teaching Award in May 2008 and May 2013. (*Id.*). He also received the Farmer School MBA Instructor of the Year award in 2008-2009 and 2009-2010, and the Miami MBA Program Elective Faculty of the Year Award in 2013, 2014 and 2017. (*Id.*). He has taught international courses since 2010, including in the Far East (2010), Europe (2012), and SE Asia (2012-2013). (*Id.*). His service has included, *inter alia*, serving on multiple departmental, divisional, and university committees, serving on a task force for the FSB, and serving as the Investment Banking Club Advisor. (*Id.*). Since his year of tenure, he has four publications. (Doc. 71-1, PageId 1720).[8] He has received higher ratings on SETs on Q1 through Q8 and on Q9 (overall rating) than Plaintiffs. (Doc. 48-1, PageId 661).

---

[8] Plaintiffs allege that he has had one publication in an "A" ranked journal and 0 publications in "A-" journals, and that, as of October 27, 2015, he had 149 citations on Google Scholar, including 117

10

Nixon was hired by Miami as an Assistant Professor in 2001 and was tenured as an Associate Professor in or about 2007. (Doc. 71-2, PageId 1731). In his position, he has taught courses in corporate finance, financial institutions, international business finance, and investments. (*Id.*). He received the Smucker Teaching Award in 2007 and 2012. (*Id.*). He also received the PSE Outstanding Professor award in 2007, the MBA Teaching Award for Best Boot Camp Instructor in 2008, and an MBA Teaching Award for Core Courses in 2016. (*Id.*). Although not reflected on his resume, Nixon shadowed as part of the FSB Far East program in 2007 and in the summer of 2011 taught in London as part of the Summer Business Institute program. (Doc. 48-1, Krehbiel Affidavit, PageId 664; Doc. 69-1, PageId 1544; Doc. 69-16, PageId 1689).[9] His service has included serving as an ad hoc referee for various business and financial journals. (Doc. 71-2, PageId 1730). Through 2012, he has presented on multiple issues in various domestic and international locations. (*Id.*). Since his year of tenure, he has five publications (one of which was in 2017). (Doc. 71-1, PageId 1720).[10] He has received higher ratings on SETs on Q1 through Q8 and on Q9 (overall rating) than Plaintiffs. (Doc. 48-1, PageId 661).

---

citations since 2010. (Doc. 22, PageId 95). He also had 40 Thompson-Reuters (SSCI) expanded citations. (*Id.*). Plaintiffs aver that their research accomplishments as compared to their male comparators' research accomplishments as alleged in the Second Amended Complaint are accurate. (*See* Doc. 69-1, PageId 1544; Doc. 69-9, PageId 1564).

[9] According to Jenkins, shadowing in international assignments does not carry the same weight as actually teaching in international assignments. (Doc. 65-1, PageId 1394).

[10] Plaintiffs allege that he has had 0 publications in an "A" ranked journal and 0 publications in "A-" journals, and that, as of October 27, 2015, he had 144 citations on Google Scholar, including 71 citations since 2010. (Doc. 22, PageId 95-96). He also had 11 Thompson-Reuters (SSCI) expanded citations. (*Id.*). Plaintiffs aver that their research accomplishments as compared to their male comparators' research accomplishments as alleged in the Second Amended Complaint are accurate. (*See* Doc. 69-1, PageId 1544; Doc. 69-9, PageId 1564).

### D. Plaintiffs' Compensation

Until academic year 2012-2013, Plaintiffs, Shrider, and Nixon were compensated commensurately with respect to their base salary. (Doc. 68, PageId 1514; Doc. 69-16, PageId 1683). In 2012, however, Shrider and Nixon were awarded much larger raise increases, resulting in a base salary wage differential going forward through the present. (Doc. 68, PageId 1514-15; Doc. 69-16, PageId 1683). The following charts reflect the undisputed compensation for Plaintiffs, Shrider, and Nixon from the 2010-2011 through 2016-2017:

**Brunarski**

|         | Base        | Base Adjustment | Summer | TOTAL   |
|---------|-------------|-----------------|--------|---------|
| 2010-11 | 130,000     |                 |        | 130,000 |
| 2011-12 | 141,000     |                 |        | 141,000 |
| 2012-13 | 151,500     |                 |        | 151,500 |
| 2013-14 | 160,500     |                 |        | 160,500 |
| 2014-15 | 165,700     |                 |        | 165,700 |
| 2015-16 | ~~172,350~~ | 183,502         |        | 183,502 |
| 2016-17 | 188,668     |                 |        |         |

**Harman**

|         | Base        | Base Adjustment | summer               | TOTAL   |
|---------|-------------|-----------------|----------------------|---------|
| 2010-11 | 130,947     |                 |                      | 130,947 |
| 2011-12 | 141,947     |                 |                      | 141,947 |
| 2012-13 | 154,447     |                 |                      | 154,447 |
| 2013-14 | 163,447     |                 |                      | 163,447 |
| 2014-15 | 168,647     |                 |                      | 168,647 |
| 2015-16 | ~~176,238~~ | 183,502         | 858 Agile Initiative | 184,360 |
| 2016-17 | 188,668     |                 |                      |         |

**Nixon**

| | Base | PMBA Teaching | winter | summer | summer | summer | Teaching Award | TOTAL |
|---|---|---|---|---|---|---|---|---|
| 2010-11 | 130,116 | | | 14,300 SBI | 23,420 ox teaching | 140 workshop | | 167,976 |
| 2011-12 | 141,116 | | | 25,400 ox teaching | | | 5,000 | 171,516 |
| 2012-13 | 163,616 | 14,725 | | 29,450 ox teaching | | | | 207,791 |
| 2013-14 | 173,426 | 15,608 | | 31,216 ox teaching | | | | 220,250 |
| 2014-15 | 179,026 | 16,112 | 16,112 ox teaching | 32,224 ox teaching | | | | 243,474 |
| 2015-16 | 183,502 | 16,515 | 16,515 study abroad | 33,030 ox teaching | | | | 249,562 |
| 2016-17 | 189,039 | 17,041 | 34,028 ox teaching | | | | 2,000 | |

**Shrider**

| | Base | PMBA Teaching | winter | summer | Teaching Award | TOTAL |
|---|---|---|---|---|---|---|
| 2010-11 | 135,000 | 28,000 | | | | 163,000 |
| 2011-12 | 149,500 | 28,000 | | 17,940 workshop lux | | 195,400 |
| 2012-13 | 173,600 | 15,000 | 10,416 workshop | 15,624 workshop | 5,000 | 219,640 |
| 2013-14 | 184,015 | 30,000 | 33,122 ox teaching | | 2,000 | 249,137 |
| 2014-15 | 191,015 | 30,000 | 34,383 workshop | 22,922 workshop | 2,000 | 280,320 |
| 2015-16 | 197,700 | 15,000 | 17,793 workshop | 6,000 research | | 236,493 |
| 2016-17 | 203,840 | 15,000 | 19,646 workshop | | | |

(Doc. 68, PageId 1515; Doc. 69-16, PageId 1685).

Timothy Krehbiel, the former Senior Associate Dean of the Farmer School of Business, avers that in 2012, the FSB awarded its regular raises for the academic year 2012-2013. (Doc. 48-1, PageId 662). He further avers that super-merit money was available for distribution to faculty and that in the 2011-2012 academic year, Finance

Department Chair Steve Wyatt recommended that the market adjustment raises be awarded to Harman, Brunarski, Nixon and Shrider. (*Id.*). He states that he reviewed all of the relevant information regarding those faculty members and recommended to Jenkins that all deserved market adjustments, but that Nixon and Shrider deserved larger raises than Brunarski and Harman. (*Id.*). They settled on the following final amounts: Harman, $10,000; Brunarski, $8,000; Nixon, $19,500; and Shrider, $21,000. (*Id.*). Krehbiel states that gender played no role in his compensation recommendations and that he recommended higher raises for Nixon and Shrider because:

> a.) Both Nixon and Shrider were involved in FSB Study Abroad programs (Shrider had lead the FSB Far East program in the summer of 2010 and was leading the FSB Europe program in the summer of 2012. Nixon had participated in the FSB Far East in 2007 and in the summer of 2011 taught in London as part of the Summer Business Institute program). Professors Brunarski and Harman were not currently or recently engaged in FSB study abroad programs. b.) Both Nixon and Shrider were recent recipients of teaching awards (Shrider had won the 2008 Smucker Teaching Excellence Award, the highest teaching honor given out by the Farmer School, the 2008-2009 MBA Professor of the Year Award, and in 2010 was nominated for Associated Student Government Outstanding Professor of the Year, perhaps the highest teaching honor awarded by Miami. Nixon had won the 2007 Smucker Teaching Excellence Award, the 2007 PSE Outstanding Professor Award, the 2008 MBA Teaching Award as the best boot camp instructor, and was just awarded the 2012 Smucker Teaching Excellence Award.). Professors Brunarski and Harman had no recent history of significant awards or recognition for the teaching. The achievements of Professors Nixon and Shrider in the areas identified by Dean Jenkins as merit criteria for super merit compensation clearly exceeded the achievements in those areas by Professors Harman and Brunarski.

(Doc. 48-1, PageId 664). It was ultimately Jenkins' decision on the recommended amount of additional compensation for that year. (*Id.*, PageId 663). Harman avers, however, that when she questioned Krehbiel on the basis for the salary discrepancies in September 2015, he did not remember why Shrider and Nixon received larger raises,

except that Jenkins had some extra money for programs in China, and he did not mention any of the specific criteria listed above. (Doc. 69-1, PageId 1543).

In 2015, Plaintiffs filed a formal complaint about being paid less than their male comparators. Matt Myers, who was now Dean of the FSB, conducted a salary analysis of the associate professors in the Finance Department in response to Plaintiffs' complaint. (Doc. 48-1, PageId 655-59). In the analysis, he compared teaching performance, scholarly performance, service, and performance history of Plaintiffs, Nixon, and Shrider. (*Id.*). For teaching performance, Myers noted that upon consideration of a three-year average of student evaluation responses for all questions, including the summary impact question known as Q9, Nixon and Shrider consistently received higher student evaluations than Plaintiffs and also noted that Nixon and Shrider had won teaching awards. (*Id.*).[11] He then compared the evaluations with other tenured female professors in the FSB, finding that some of those evaluations were at the level of Nixon and Shrider, and above that of Plaintiffs. (*Id.*, PageId 656). For scholarly performance over the prior five years, he indicated that the research records of the four were similar until 2014-2015 when Plaintiffs had two publications in a Top 10 journal. (*Id.*). As for service, he found that all four professors had comparable service records. (*Id.*). Considering bias, Myers indicated:

> I cannot speak to the reasoning behind the differences in salaries since 2011, as neither the former dean nor former department chair are still with the school. However, it seems reasonable that Profs. Shrider and Nixon would have received higher raises due to their teaching, not due to their gender, although the amount of the raises, particularly for Shrider in 2012, are unexplained. . . . Thus, it is difficult to answer whether there was or was not bias.

---

[11] Plaintiff Brunarski avers that it is consistent with her experience at Miami that Q9 (the overall rating) on SETs is relied on heavily, and often exclusively, to measure teaching effectiveness. (Doc. 69-9, PageId 1555).

(*Id.*, PageId 658).   Based on his analysis, Myers recommended that the records of Plaintiffs be considered on par with Nixon and that their salaries be brought to the same level. (*Id.*, PageId 659).   Myers further testified that he was unable to find a reason for the raise discrepancies in 2012 when he researched that issue.   (Doc. 51-1, PageId 884).

Compensation data from the FSB reflects average base compensation for 125 male professors over the past ten years is slightly less than the average base compensation for 33 female professors.   (Doc. 45-1, Ex. B. to Brunarski Dep., PageId 444-45).   That compensation data, however, does not contain an analysis of the data with respect to job title, tenure status, or other similar factors. (*See id.*).

### E. Evidence of Gender Bias in SETs

Philip Stark, Ph.D., Plaintiffs' expert witness in this case, is a professor at the University of California, Berkeley, and has provided an opinion regarding the SETs utilized by Miami in evaluating teacher performance. (Doc. 34-1, PageId 142-58).   Dr. Stark opines that the use of SETs as a component of salary determinations unfairly penalizes female faculty in the quantitative business disciplines of Finance, Accounting, and Information Systems and Analytics.   (*Id.*).   Dr. Stark bases his analysis on Brunarski's aggregation of SET data provided by Miami from Fall 2012 to Fall 2015 using business statistical tools used in the Finance Department.   (*Id.*, PageId 153-54). He performed two statistical analyses of the SET data, one examining Q9 of the SETs alone, and one examining the difference between Q9 and the average of Q1-Q8.   (*Id.*). Based on those analyses, he concluded that, on average, Q9 scores are lower for female instructors than for male instructors, in a range from 0.31 points to 0.75 points in

different semesters and 0.47 points on average across years, which is statistically significant. (*Id.*, PageId 154-55). That average point differential is the difference between a 45th percentile (slightly below average) rank among all faculty and an 85th percentile (almost exceptional) rank among all faculty. (Doc. 69-9, PageId 1562). He further indicates that the difference between the average of Q1-Q8 and Q9 is on average larger for female instructors than for male instructors in all seven semesters. (Doc. 34-1, PageId 155; Doc. 46-1, PageId 530-32). He characterizes this difference as a "gender penalty," which ranges from 0.144 points in Fall 2015 to .433 points in Fall 2013. (Doc. 34-1, PageId 155). That difference is statistically significant. (*Id.*). Dr. Stark testified, however, that there is the possibility that the differences could be attributable to Plaintiffs not being as good of teachers as Nixon and Shrider. (Doc. 46-1, PageId 551).

Further, in January 2016, a Gender Equity and Inclusion Task Force was commissioned in the FSB by Myers. (Doc. 69-13, PageId 1576-77).[12] The task force was charged with identifying areas of concern relative to gender equity and inclusiveness, and with providing recommendations for improving the climate within the FSB. (*Id.*, PageId 1577). On January 3, 2017, the task force issued its "Final Report." (*Id.*, PageId 1576-1621).[13] Included within the Final Report's many findings and recommendations is the following: "The task force has concerns over potential gender . . . biases in student evaluations of teaching. . . . It appears clear that effective teaching

---

[12] Plaintiff Brunarski's affidavit relies on hearsay statement from Shevonne Nelson about a gender bias study conducted by Miami. (Doc. 69-9, PageId 1565). No evidence has been submitted corroborating that statement, and it is not one that was obviously made in a capacity as an agent or employee on a matter within the scope of her employment with Miami on which she had authority and knowledge on which to speak.

[13] Although Miami notes that this Final Report occurred approximately 5 years after the super-merit raises, it does not challenge the Final Report as wholly inadmissible. Further, the report considers data for time periods relevant to this case.

cannot be entirely (if at all) measured by SET and thus there needs to be greater emphasis placed on multiple measures of teaching effectiveness in the tenure and promotion process." (*Id.*, PageId 1591). The Final Report also included findings that "FSB is well below the AACSB national average in hiring women into tenure track positions; a lower proportion of women are tenured than are men; and, both women and multicultural faculty are promoted to full professor after a greater length of time than are men and majority faculty." (*Id.*, PageId 1578). More specifically, the Final Report provides:

> Tenure rates of assistant professors hired between 1986 and 2005 were relatively stable, with an average of 52% of women and 67% of men receiving tenure. The cohort hired between 2006 and 2010 presents a different pattern, with none of the women (n=3) and 85% of the men receiving tenure. Considering all the assistant professors hired from 1986-2010, men have received tenure at a significantly higher rate than women, 70% to 47%.
>
> . . . .
>
> Over time, the proportion of women associate professors being promoted to full professor has increased significantly, and in the cohorts hired 1996-2005, the proportion of women promoted was higher than the proportion of men. However, the median time between being tenured and promoted is 7 years for women and 5.5 years for men. Moreover, a higher percentage of male faculty were put on a "fast track" to full as compared to their female counterparts: the percent of associate professors promoted in 5 years or less is 14% for women (1 of 7) and 50% for men (8 of 16).
>
> . . . .
>
> Since the first hire of a clinical faculty member in 1996, the FSB has hired 8 women and 13 men. Of the six promoted to senior rank, three are women and three are men. One female was also promoted to assistant professor. The mean years in rank before these promotions is approximately five for each gender. Currently there are 15 clinical/lecturer faculty (7 women and 8 men), and five of these have been promoted to senior status (3 women and 2 men).

(Doc. 69-13, PageId 1590-91).

## III.    ANALYSIS

The EPA prohibits employers from paying an employee at a rate less than that paid to employees of the opposite sex for equal work. 29 U.S.C. § 206(d)(1). A burden shifting analysis applies to an EPA claim.

### A.  Plaintiffs Have Set Forth a *Prima Facie* Case.

To establish a prima facie case of wage discrimination under the EPA, the plaintiff must demonstrate that the employer paid employees of the opposite sex different wages for equal work or for jobs the performance of which requires equal skill, effort, and responsibility or are performed under similar working conditions. *Foco v. Freudenberg-NOK Gen. P'shp*, 549 F. App'x 340, 344 (6th Cir. 2013) (citing *Beck-Wilson v. Principi*, 441 F.3d 353, 359 (6th Cir. 2006)). "The two jobs need not be identical, but rather only 'substantially equal.'" *Id.* (citing *Beck-Wilson*, 441 F.3d at 359). "Whether jobs are substantially equal for purposes of the EPA is determined on a case-by-case basis and 'resolved by an overall comparison of the work, not its individual segments.'" *Id.* (quoting *Odomes v. Nucare, Inc.*, 653 F.2d 246, 250 (6th Cir. 1981)). "Proving a violation of the EPA does not require proof of intent to discriminate." *Id.* (citing *Beck-Wilson*, 441 F.3d at 360).

Here, Plaintiffs have made a sufficient showing on their *prima facie* case to survive summary judgment. Plaintiffs have presented evidence showing that their base salary was substantially less than the base salary of Nixon and Shrider, particularly from the 2012-2013 academic year until the 2015-2016 academic year when Plaintiffs' base salary was adjusted to be on par with the base salary of Nixon.[14] Plaintiffs' base salary

---

[14] That discrepancy, however, is less substantial than before the 2015-2016 upward adjustment.

again fell below the base salary of both Nixon and Shrider for the 2016-2017 academic year.

As for the particular jobs of the four professors, it is undisputed that Plaintiffs, Nixon, and Shrider shared the job title of tenured Associate Professors, had relatively similar hire dates,[15] and worked in the Finance Department under the same Department Chair. The record evidence construed in favor of Plaintiffs also shows that each of those professors had a nine-month contract for their employment that covered the Fall and Spring academic terms. Their base salary, which is what is at issue here, reflected work performed in the Fall and Spring terms only. Compensation for the Summer and Winter terms, MBA Program courses, workshop classes, and study-abroad courses is separate from the base salary for the Fall and Spring terms. During the Fall and Spring terms, each professor was responsible for a course load within the Finance Department and for participating in research projects and/or other service to Miami. While there may have been variances in the specific courses taught or the particular research or service projects of each professor, the record evidence does not plainly show that these differences significantly altered the skill, effort, responsibilities, or working conditions for the position. Given that the two jobs need not be identical, the Court finds that the record evidence is sufficient to establish a *prima facie* case for purposes of summary judgment *See Storrs v. Univ. of Cincinnati*, No. 1:15-CV-136, 2017 WL 4270516, at *20 (S.D. Ohio Sept. 26, 2017) (holding that plaintiff had met her burden of showing a *prima facie* case under the EPA based on evidence her and her male comparators were Assistant Professors in the Geography Department who were governed by the same standards and by evidence that she was paid less than her male comparators).

---

[15] In fact, Nixon and Shrider were hired and tenured *after* Plaintiffs.

**B. Miami Has Not Met Its Burden of Proof on its Affirmative Defense.**

When the plaintiff establishes a *prima facie* case under the EPA, the employer has the opportunity to prove that the pay differential is due to one or more of the four statutory affirmative defenses: "'(1) a seniority system; (2) a merit system; (3) a system which measures earnings by quantity or quality of production; or (4) any other factor other than sex.'" *Foco*, 549 F. App'x at 344 (quoting *Buntin v. Breathitt Cnty. Bd. of Educ.*, 134 F.3d 796, 799 (6th Cir. 1998)). When a bona fide merit system is established, the use of subjective criteria within that merit system does not necessarily preclude it from constituting an affirmative defense. *Harrison-Pepper v. Miami Univ.*, 103 F. App'x 596, 601 (6th Cir. 2004). As for a "factor other than sex," that defense does not encompass all other factors, and it must, at a minimum, be a factor that was adopted for a legitimate business reason. *Perkins v. Rock-Tenn Servs., Inc.*, 700 F. App'x 452, 457 (6th Cir. 2017) (citing *E.E.O.C. v. J.C. Penney Co.*, 843 F.2d 249, 253 (6th Cir. 1988)).

However, unlike under Title VII where a defendant only must *assert* a legitimate, non-discriminatory reason for the treatment at issue before the burden shifts back to the plaintiff to show pretext, the Equal Pay Act requires that the defendant bear the burden of *establishing* its affirmative defense. *Perkins*, 700 F. App'x at 457 (citing *Beck-Wilson*, 441 F.3d 360). "An employer is entitled to summary judgment on one of the affirmative defenses 'only if the record shows that they established the defense so clearly that no rational jury could have found to the contrary.'" *Foco*, 549 F. App'x at 344. In other words, "'[t]he employer must prove that sex provides *no part* of the basis for the wage differential' in order to prevail on summary judgment." *Balmer v. HCA, Inc.*, 423 F.3d

606, 612 (6th Cir. 2005) (quoting *Timmer v. Mich. Dep't of Commerce*, 104 F.3d 833, 843 (6th Cir. 1997)), *abrogated on other grounds by Fox v. Vice*, 563 U.S. 826 (2011). That burden is a "heavy one." *Timmer*, 104 F.3d at 843.

"[T]he defendant *always* bears the burden of proving that its proffered reason is the true basis for the pay differential." *Buntin v. Breathitt Cty. Bd. of Educ.*, 134 F.3d 796, 800 fn. 7 (6th Cir. 1998). The plaintiff "bears the burden of *producing* evidence of pretext solely where a reasonable jury viewing the defendant's evidence could find only for the defendant; the plaintiff, however, never bears the burden of *persuasion* regarding the affirmative defenses." *Id.*

Here, Miami relies on the affirmative defenses of (1) a merit-based system and (2) any factor other than sex. (Doc. 48, PageId 622). Miami argues that the base salaries of Plaintiffs were commensurate with the base salaries of Nixon and Shrider until 2012. (*Id.*, PageId 625). Miami contends that in 2012, Shrider and Nixon received larger super-merit raises that created the base salary differential going forward, and that those super-merit raises were based on involvement in FSB study abroad programs, exceptional performance in teaching as demonstrated through significant accomplishment, recognition, and awards, and exceptional performance in research as demonstrated by significant accomplishment, recognition and awards, all areas in which Miami claims Nixon and Shrider surpassed Plaintiffs. (*Id.*, PageId 625-26). It claims that "raising the profile of the University by designing and supervising study abroad programs and demonstrating exceptional performance in teaching and research are legitimate business goals of any institution of higher education." (Doc. 48, PageId 626).

Although Miami has articulated three facially neutral factors relating to the professors' achievements and accomplishments for the pay disparity, the undersigned finds that Miami has not met its burden of *proving* its affirmative defense.[16]

### 1. There are genuine issues of material fact as to the factors applied and considered for the 2012 super-merit raises.

Unlike the cases upon which Miami relies in support of its affirmative defense,[17] Miami has not proven that the three factors articulated by Krehbiel were the actual factors relied upon to award the 2012 super-merit raises.

The testimony on the actual standard used for super-merit raises is conflicting. Miami's standard factors for awarding raises are teaching, research, and service. Teaching and research generally receive equal weight while service is entitled to lesser weight. According to Jenkins, the Dean of the FSB at that time, those same standard factors were used when awarding super-merit raises. These categories are broad and include consideration of teaching effectiveness as reflected by SETs as well as all types

---

[16] Although Plaintiffs concede that Miami "articulates" an affirmative defense consistent with Title IV burden shifting framework, they have not conceded that Miami *proved* that affirmative defense, as reflected by their additional arguments. (Doc. 69, PageId 1540-41).

[17] In each of those cases, the employer had adopted a clear standard that it showed had been communicated to the employees and/or consistently and evenhandedly applied to all employees. *E.E.O.C. v. J.C. Penney Co.*, 843 F.2d 249, 253-54 (6th Cir. 1988) (holding that employer justified its adoption of a fringe benefit plan that disparately impacted one sex with substantial evidence supporting its clear legitimate business reason of providing the greatest benefits for those who need coverage); *Willner v. University of Kansas*, 848 F.2d 1023 (10th Cir. 1988) (affirming the district court's finding at a bench trial that the University of Kansas had not violated the EPA based upon findings that the professors knew of the factors upon which their salary increases were based and that the plaintiff failed to properly submit the necessary materials for evaluation in a timely manner, which resulted in her not receiving a salary increase); *Summy-Long v. Pennsylvania State Univ.*, 226 F. Supp. 3d 371, 415-16 (M.D. Pa. 2016) (granting summary judgment on defendant's affirmative defense to an EPA claim where documentation had been submitted showing the professors were aware of the criteria on which they were being judged for the particular salary raises, including publications, and showing the plaintiff failed to publish at the same rate as her male colleagues in the preceding years); *E.E.O.C. v. Cleveland State Univ.*, Nos. C80-311 and C81-560,1982 WL 320, at *13 (N.D. Ohio May 10, 1982) (district court recognized that the defendant had established its affirmative defense under the EPA by showing a seniority or merit system based on competent teaching and research under which a competent teacher was compensated with an average salary increase while research and publication were rewarded with better than average salary increases).

of special teaching assignments and service.[18]  When Myers, the current Dean of the FSB, investigated the salary discrepancies in 2015, he was unable to determine the reason for the large discrepancies.  Interestingly though, Myers also applied the three standard categories identified by Jenkins in his analysis.  Based on those standard factors, he found the only area of real distinction dating back to the super-merit increases to be the SETs on which Nixon and Shrider scored higher than Plaintiffs, which SETs Plaintiffs have challenged as gender biased in this case.[19]  Nonetheless, the four professors had received comparable raises under the standard factors used for merit raises up until 2012.

The testimony of Krehbiel, the Senior Associate Dean of the FSB at that time, differs from that of Jenkins and attempts to remove SETs from the equation.  Krehbiel testified that the three specific areas focused upon for the 2012 super-merit awards were FSB study-abroad programs, teaching awards, and research awards, which Krehbiel states did not include a review of SETs.  When the record evidence is construed in favor of Plaintiffs, however, it shows that both the FSB study-abroad programs and the teaching awards were based in part on SETs, as discussed further below.

There also is no record evidence identified by Miami that shows the three factors articulated by Krehbiel previously had been used to award super-merit raises or any other raises.  To the extent they were used in 2012 instead of the standard factors

---

[18] This means that the analysis would consider Harman's $1 million Department of Homeland Security grant on which she served as the primary investigator, which falls into the service category, and Brunarski's *Corporate Payout Policy* seminar, which is a special teaching assignment. (*See* Doc. 65-1, PageId 1406;69-9, PageId 1566).
[19] In service and research, the four professors were largely comparable.  He noted, however, that the research history of Plaintiffs was stronger since their publications in a Top 10 journal in 2014.

24

identified by Jenkins, those factors are a deviation from the usual practice of the FSB. Miami has pointed to no evidence that these new three factors were communicated to professors, either formally or informally, as the standard for awarding the 2012 super-merit raises, either prior to or at the time of the raises. With respect to FSB study abroad in particular, no record evidence reflects that professors were informed that such service, which already is compensated separately from base salary, would receive special consideration in the award of super-merit raises. Indeed, Harman avers that she questioned Krehbiel about the 2012 super-merit raises in September 2015 after she learned about the large discrepancy in the awards between herself, Brunarski, Shrider and Nixon. At that time Krehbiel represented to Harman that he did not remember why Shrider and Nixon received larger raises, except that Jenkins had some extra money for programs in China. He mentioned none of the specific factors he now lists and did not attribute the large salary increases to teaching awards.

Miami also has set forth no evidence that indicates these three factors were applied consistently and evenhandedly across the FSB. It has not identified a single individual in the FSB aside from the two male comparators who received a comparable salary increase based on a record similar to the male comparators under those three factors. Plaintiffs, on the other hand, have presented evidence that Dr. Barr, a professor of marketing, taught a FSB study-abroad program in 2011, but did not receive a super-merit raise in 2012. (Doc. 69-1, PageId 1544).

Further, Miami's application of the three factors to Plaintiffs does not reflect raises were directly commensurate with satisfaction of the three factors. Miami indicates (based on Krehbiel's affidavit) that neither Brunarski nor Harman satisfied the

25

first two factors. That means that Brunarski and Harman had to satisfy the third factor (exceptional performance in research) to earn a super-merit raise. Although Miami concedes that Brunarski had two publications that arguably could have fallen into this category, it claims that Harman had none. (Doc. 71, PageId 1713-14). Based on that, Brunarski should have received a super-merit raise but Harman should not have. But the actual raises awarded do not bear out this logic. Instead of Harman receiving no raise, she received a *larger* raise than Brunarski.[20] Even if Harman had a research record on par with Brunarski's at the time, as suggested by Myers in 2015, there still is no explanation as to why Harman received a larger raise than Brunarski, rather than an equal one. Nor has Miami explained why Nixon and Shrider were awarded raises between $9,500 and $13,000 more than Plaintiffs based on two factors for which they already had been separately compensated. In his 2015 assessment of the raises, Myers also questioned the amount of the raises to the male comparators, and particularly to Shrider, noting that the amounts were unexplained. As for Krehbiel, he avers that he did not remember how the amounts were set, but that Jenkins had ultimate approval of the awards. Without any information on the general method for setting the raise amounts and on how that general method was applied in the FSB, the undersigned is unable to evaluate whether the amounts of the super-merit raises were commensurate with the satisfaction of the three criteria and were not based in any part

---

[20] Construing the evidence favorably to Plaintiffs, Harman had published research from 2007-2012, as Myers's assessment of the salary indicated that the research publication of the four professors was relatively equal at the time of the 2012 super-merit raises and Harman has indicated she has published seven articles since she was tenured in 2006. Miami's statement that Harman had no research publications from 2007-2012 thus only adds to the lack of clarity about what information was or was not considered when awarding the super-merit raises.

on gender, particularly considering that under the standard factors the four had received roughly equivalent annual raises both before and after the 2012 super-merit raises.

When the record evidence on Miami's affirmative defense as a whole is construed favorably to Plaintiffs, there is a genuine issue of material fact as to whether the three factors articulated by Krehbiel were predetermined factors for the award of all 2012 super-merit raises within the FSB or are instead post-hoc rationalizations for the pay disparities that resulted from the 2012 super-merit raises between Plaintiffs and the male comparators within the Finance Department. Krehbiel's conclusory statement that gender played no role in the 2012 super-merit raises is not enough for Miami to meet its burden of establishing its affirmative defense so clearly that no rational jury could find to the contrary.

### 2. Miami's specific evidence of a legitimate business reason for utilizing the three factors articulated by Krehbiel is lacking.

Adding to the genuine issues of material fact about which factors were considered in awarding the 2012 super-merit raises and how those factors were applied is the absence of specific evidence demonstrating Miami had a legitimate business reason for utilizing the three factors articulated by Krehbiel. Although Miami claims generally that the three factors satisfy legitimate business goals of any university (Doc. 48, PageId 626), the same could be said for almost any individual factor it chose to now focus on that somehow relates to teaching, research, or service. Had Miami articulated, for example, the award of significant research grants by a professor or all special teaching assignments, as factors, those likewise would relate to a business goal of any university.

Given that these factors—particularly the emphasis placed on FSB study abroad and teaching awards—constitute a deviation from the standard factors utilized for raises and that there is no evidence that these factors were communicated to professors at or near the time of the 2012 super-merit awards, Miami must put forth more evidence of its specific business reasons than a generalized statement that the factors somehow satisfy a business goal of any university. In other words, it must show that there was an actual legitimate business purpose of Miami or the FSB for its focus on these factors to the exclusion of other factors typically considered when awarding a merit raise under the standard factors.[21] Miami has directed the undersigned to little evidence concerning its legitimate business reasons for application of these three factors to the exclusion of other factors.[22]

### 3. There are genuine issues of material fact as to whether the SETs were gender biased.

Not only has Miami not clearly demonstrated the existence of a bona fide merit system or the presence of a legitimate business reason to show a factor other than sex,[23] but the facts construed in favor of Plaintiffs indicate that the two factors that purportedly distinguished the male comparators from Plaintiffs are derived from a

---

[21] Krehbiel avers that Jenkins wanted to use the super-merit raises to differentiate those faculty members who in the past several years had met that criteria, Jenkins did not testify as to that being the purpose of the super-merit raises and instead testified that the standard criteria for regular merit raises is applied to super-merit raises.

[22] For the FSB study-abroad courses, there is conflicting testimony from Jenkins and Callahan on whether this has any bearing on teaching effectiveness and Jenkins testified that teaching during Summer or Winter terms does not bear on base salary, as professors are encouraged to use that time for research and scholarship. Given this testimony, it is unclear why this was a specific focus for the super-merit raises or whether the involvement of the male comparators in these programs warranted the significant discrepancy in pay. For teaching awards, Miami has not explained why it used this one measurement of teaching effectiveness as opposed to all measures of teaching effectiveness similar to the standard raises.

[23] As noted in *E.E.O.C. v. J.C. Penney*, 843 F.2d 249, 253 (6th Cir. 1988), there is not "blanket bar to all claims of wage discrimination based on disparate impact" because the "factor other than sex" defense only applies when the defendant proves the factor was adopted for a legitimate business reason, which Miami has not done here, as explained above.

source with sex-based differentials. In particular, the record evidence shows that the invitations to teach in FSB study abroad programs and the teaching awards, including the Smucker Teaching Award in particular, depended to some degree upon SETs.[24] That evidence conflicts with Krehbiel's averment that the factors he examined did not include analysis or review of SETs.[25]

Plaintiffs have produced the expert testimony of Dr. Stark as evidence of gender bias in SETs. Dr. Stark opines that there is systematic gender bias in SETs that negatively impacts female professors, a conclusion with which Miami's *Gender Equality and Inclusion Task Force-Final Report* appears to concur.[26] He indicates that his statistical analysis of SETs from Miami from Fall 2012 to Fall 2015 reveals lower overall ratings in Q9 (the question Oakenfull identified as most focused upon by the Teaching Effectiveness Committee) for tenure and tenure-track female professors than for male professors in quantitative business disciplines in a range that is statistically significant (it ranges from 0.31 points to 0.75 points in different semesters, and is 0.47 on average across years). This point differential is the difference between a 45th percentile (slightly below average) rank among all faculty and an 85th percentile (almost exceptional) rank

---

[24] For the FSB study abroad, the evidence construed in favor of Plaintiffs shows that the opportunities are invitation only and may be based on SETs as well as informal verbal feedback the faculty receives from students about a professor's effectiveness. Although the student feedback is not formalized as a SET, it is logical to infer that the analysis as to SETs would translate to unstructured student feedback as well.

[25] In its motion, Miami contends that the current compensation differential "is wholly unrelated to student teaching evaluations." (Doc. 48, PageId 625). Miami admits in its reply brief, however, that SETs may have "had some tangential or minimal effect upon criteria number 2" but claims they were not a "direct or primary factor" in the decision for awarding super-merit raises. (Doc. 71, PageId 1707). Although this argument is raised in the context of pretext, Miami bears the burden of persuasion on its affirmative defense.

[26] Specifically, Miami's *Gender Equity and Inclusion Taskforce – Final Report* indicates that "[i]t appears clear that effective teaching cannot be entirely (if at all) measured by SET and thus there needs to be a greater emphasis placed on multiple measures of teaching effectiveness in the tenure and promotion process." (Doc. 69-13, PageId 1591). Although Plaintiffs and Miami cite to data from that report as support for their respective positions, the undersigned finds that the data is inconclusive as to gender bias with FSB, as it reflects some gender disparities in some practices within the FSB as well as no gender disparities with respect to other practices within the FSB.

among all faculty. He further indicates that the difference between the average of Q1-Q8 and Q9 is on average larger for female instructors than for male instructors in all seven semesters. He characterizes this difference as a "gender penalty," which ranges from 0.144 points in Fall 2015 to 0.433 points in Fall 2013 within Miami's qualitative business disciplines. There is no dispute that Harman and Brunarski received lower ratings in formal SETs than the male comparators in a qualitative business discipline. As additional evidence, Brunarski has pointed to a sampling of accolades received from students prior to 2012 about her courses. Based on this evidence, an inference thus could be made that Harman and Brunarski's SETs scores reflect a gender penalty.

While there nonetheless exists the possibility that Plaintiffs were less effective teachers than either Nixon or Shrider, Miami has not pointed to any record evidence that conclusively shows Plaintiffs received lower SET scores because they were overall less effective professors. Rather, Miami focuses on the fact that Shrider and Nixon earned higher scores because they were *more* effective professors. The strongest of that evidence is that Shrider and Nixon both won school-wide teaching awards, which reflects that they not only exceeded Plaintiffs but also exceeded every professor in the FSB in the years of their respective awards. Yet, even if that reflects the excellent performance of those two professors, it does not negate the fact that Plaintiffs still could be equally effective professors who lacked the opportunity to compete for the awards because of gender-biased SETs. Indeed, as Plaintiffs have indicated, the addition of the difference between Q9 scores to the female professors' scores could be the difference between 45th percentile and 85th percentile in ranking among all faculty, which is significant.

30

As for the statement of Dean Myers in 2015 on which Miami relies that provides that "Shrider and Nixon have proven themselves to be among the best teachers in the [Farmer School of Business]" while "Harman and Brunarski are average teachers in the school" (Doc. 71, PageId 1710), Myers appears to make that assessment based on SET scores. That statement does not clearly show that no bias was present in the SET scores upon which the teaching awards or international teaching opportunities are based. The same is true with respect to Myers's comparison of the SET scores of other females in the FSB, some of whom received scores similar to or higher than Nixon and Shrider. While certainly that evidence – like Plaintiffs' statistical evidence of lower SET scores of female professors within quantitative business disciplines—has some probative value with respect to SET gender bias, it does not conclusively establish that gender played no role in the pay differentials in this case.[27]

The compensation data relied upon by Miami that reflects an average base compensation for the 125 male professors that is slightly less than the average base compensation for the 33 female professors over the past ten years also provides some context for the evaluation of gender bias. However, the data does not identify relevant factors such as jobs titles and tenure status that allow the undersigned to meaningfully assess the value of that evidence in this case.

---

[27] In addition to the SET gender bias, Plaintiffs suggest that there also was gender bias within the Finance Department that would preclude them from receiving a teaching award. In particular, they note that the department chair of the Teaching Effectiveness Committee had to provide strong support for a candidate to receive a teaching award, but that the Finance Department's chair had always been a male professor who tended to support his male colleagues. There is no specific evidence, however, that would allow for a conclusion that each male professor on the Teaching Effectiveness Committee demonstrated gender bias. There are no gender-biased comments attributable to any of those male professors who served as the department's chair or any other similar type of evidence that would allow for the inference of gender bias in the support from the department chair through 2012.

Additionally, the cases upon which Miami relies to demonstrate the SETs were unbiased are distinguishable. *See Dobbs-Weinstein v. Vanderbilt University*, 1 F. Supp. 2d 783 (M.D. Tenn. Jan. 20, 1998); *Jiminez v. Mary Washington College*, 57 F.3d 369, 381 (4th Cir. 1995); *Brousard-Norcross v. Augustana College Ass'n*, 935 F.2d 974 (8th Cir. 1991). Unlike in *Dobbs-Weinstein*, *Jiminez*, and *Brousard-Norcross*, this is not a tenure case that requires extra scrutiny nor is it a Title VII case where the burden of proof on bias rests with the plaintiff. Rather, this is a pay raise disparity case under the EPA where Miami—not Plaintiffs—bears the burden of proving gender played no part in the disparity, a burden which it has not met for the reasons previously explained. The record evidence in those cases also is distinguishable from this case because (1) Plaintiffs have produced significant expert and statistical evidence of gender bias in the SETs in the aggregate and within the FSB, along with evidence of their own SETs being lower than those of their male comparators, as explained above, and (2) Miami has not presented evidence equivalent to the significant evidence from the defendants in those cases showing the professors actually were low performers such that gender bias was not a factor in the lower SET scores. *Dobbs-Weinstein*, 1 F. Supp. 2d at 801 (noting that the plaintiff *did not challenge the assumption in the aggregate* that "student reaction is a legitimate, nondiscriminatory factor on which to evaluate tenure candidates" but challenged instead only as applied to an individual case, and finding that under the individual circumstances of the case, the professor did not show bias in student evaluations affected her tenure process, particularly considering the professor did not actually receive low ratings and actually received higher average ratings than her colleagues); *Jiminez*, 57 F.3d at 379-82 (finding that decision of college to give

professor a terminal contract, rather than keep him in a tenure-track position, was justified where significant evidence showed the professor was ineffective in teaching and the undated and unsigned letters from several students claiming that some other unnamed bigoted students intentionally provided negative feedback to discriminate against the plaintiff was insufficient to establish a "conspiracy theory" based on student bias);[28] *Brousard-Norcross*, 935 F.2d at 976 (finding that where student evaluations were highly critical of the professor's performance and plaintiff had provided no evidence of gender bias in the evaluation forms or the comments on them, the college's tenure decision was justified).

Based on the foregoing analysis, the undersigned finds that Miami has not met its burden on summary judgment of proving its affirmative defense. While there may be distinctions between the four professors' overall accomplishments, there are genuine issues of material fact concerning whether the three factors articulated as Miami's affirmative defense were predetermined factors used reasonably and consistently to award the super-merit raises or are instead post-hoc rationalizations for the super-merit raises that utilize factors negatively impacting females over males within the FSB.

## IV. CONCLUSION

Consistent with the foregoing analysis, **IT IS RECOMMENDED** that Defendant's motion for summary judgment (Doc. 48) be **DENIED**.

Stephanie K. Bowman
United States Magistrate Judge

---

[28] *Jiminez* was not a summary judgment decision; rather, it was an appeal of a district court's decision on the merits following a bench trial.

KELLY BRUNARSKI, et al.,                          Civil Action No. 1:16-cv-311

    Plaintiffs,                                   Dlott, J.
                                                  Bowman, M.J
    vs.

MIAMI UNIVERSITY,

    Defendant.

## NOTICE

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to this Report and Recommendation ("R&R") within **FOURTEEN (14) DAYS** of the filing date of this R&R. That period may be extended further by the Court on timely motion by either side for an extension of time. All objections shall specify the portion(s) of the R&R objected to, and shall be accompanied by a memorandum of law in support of the objections. A party shall respond to an opponent's objections within **FOURTEEN (14) DAYS** after being served with a copy of those objections. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).